SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
 James P. Hill, CA Bar No. 90478
 Christopher V. Hawkins, CA Bar No. 222961
 Kathleen Cashman-Kramer, CA Bar No. 128861
600 B Street, Suite 1700
San Diego, CA 92101
Telephone:   (619) 233-4100
Facsimile:    (619) 231-4372
hill@sullivanhill.com
hawkins@sullivanhill.com

Counsel for Debtor and Debtor in Possession,
Ingenu, Inc.

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO. 20-03779-LT11 |
| INGENU, INC., | Chapter 11 |
| Debtor. | **DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION FOR THE DEBTOR DATED OCTOBER 30, 2020** |
| | Date:      December 15, 2020 |
| | Time:      9:00 a.m. |
| | Ctrm:      Dept. 3, Room 129 |
| | United States Bankruptcy Court |
| | 325 West F Street |
| | San Diego, CA 92101-6991 |
| | Judge:      Hon. Laura S. Taylor |

# TABLE OF CONTENTS

**Page**

DISCLAIMER ................................................................................................. 1

I.      INTRODUCTION ................................................................................... 4

    A.      General ......................................................................................... 4

    B.      Brief Summary of Plan ................................................................. 4

    C.      Voting Instructions and Procedures ............................................. 7

        1.      Voting Procedures, Ballots and Voting Deadline ................ 7

        2.      Voting Record Date ............................................................. 9

        3.      Incomplete Ballots ............................................................. 9

        4.      Defects, Irregularities, Etc. ................................................. 9

        5.      Withdrawal of Ballot ......................................................... 10

    D.      Confirmation Hearing ................................................................. 11

II.     CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILING ................................................................................................... 11

    A.      The Debtor's Business ................................................................ 11

    B.      The Debtor's Bankruptcy Filing ................................................ 12

    C.      Summary of Prepetition Secured Indebtedness ......................... 13

III.    EVENTS DURING THE CHAPTER 11 CASE ..................................... 14

    A.      DIP Financing ............................................................................ 14

    B.      Retention of Counsel .................................................................. 15

    C.      Retention of Sherwood and Marketing Process ......................... 15

    D.      Claims Bar Date .......................................................................... 15

IV.     SUMMARY OF THE PLAN ................................................................ 15

    A.      Introduction ................................................................................ 15

    B.      Classification of Claims and Interests ....................................... 16

    C.      Treatment of Claims and Interests and Summary of Distributions under the Plan ............................................................................. 17

        1.      Administrative Claims ....................................................... 17

2.      Allowed Priority Tax Claims...................................................... 19

3.      DIP Facility Claims .................................................................... 19

4.      Summary of Classification and Treatment of Holders of Allowed Claims and Interests that are Placed in Classes............ 19

D.      Means for Execution of the Plan.......................................................... 29

1.      Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor .................................................................... 29

2.      Corporate Action ...................................................................... 30

3.      Certificate of Incorporation and Bylaws .................................. 30

4.      Release of Liens......................................................................... 30

5.      Cancellation of Interests and Authorization and Issuance of New Stock ................................................................................. 31

6.      The Exit Facility ....................................................................... 31

7.      Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor........................................................ 33

8.      Disbursing Agent ...................................................................... 34

9.      Closing of Case .......................................................................... 34

10.     Effectuating Documents; Further Transactions......................... 34

11.     Withholding and Reporting Requirements ................................ 35

12.     Quarterly Reports and United States Trustee's Fees.................. 35

13.     Preservation of Causes of Action .............................................. 35

14.     No Liability for Solicitation or Participation............................. 37

15.     Exemption From Certain Taxes.................................................. 37

E.      Distribution Provisions ........................................................................ 38

1.      Distributions.............................................................................. 38

2.      Distributions of Cash ................................................................ 38

3.      Effective Date and Subsequent Distributions............................ 38

4.      Delivery of Distributions and Undeliverable Distributions ....... 38

5.      Time Bar to Cash Payments and Disallowances ....................... 39

6.      Minimum Distributions ............................................................. 39

7. Transactions on Business Days ................................................. 40

8. Distributions after Allowance ................................................. 40

9. Disputed Payments ................................................................ 40

10. No Distributions in Excess of Allowed Amount of Claim ......... 40

11. Reservation of Claim Objections ............................................ 40

F. Treatment of Executory Contracts and Unexpired Leases ................ 41

1. Rejection of Executory Contracts and Unexpired Leases ......... 41

2. Bar Date for Filing Rejection Claims .................................... 42

G. Conditions Precedent to Effectiveness of the Plan ........................ 42

1. Conditions to the Effective Date ........................................... 42

2. Waiver of Conditions .......................................................... 43

H. Modification of the Plan .......................................................... 43

I. Releases and Related Matters .................................................... 43

1. Releases by Holders of Claims for Post-Petition Conduct ........ 43

2. Releases by the Debtor ......................................................... 44

3. Injunction Related to Releases ............................................... 45

J. Dissolution of the Committee .................................................... 46

K. Default .................................................................................. 46

L. Effect of Confirmation of the Plan ............................................ 47

1. Discharge of the Debtor ....................................................... 47

2. Injunction ........................................................................... 48

3. No Waiver of Discharge ....................................................... 49

4. Binding Effect ..................................................................... 49

5. Term of Injunctions or Stays ................................................ 49

V. THE REORGANIZED DEBTOR .................................................... 49

A. The Exit Financing ................................................................. 49

B. Issuance of New Common Stock ............................................... 50

C. Business and Property of the Reorganized Debtor ........................ 50

D.      Management of the Reorganized Debtor ................................. 50

E.      Projected Financial Information ........................................... 50

VI.     CONFIRMATION OF THE PLAN ................................................... 51

A.      Introduction ...................................................................... 51

B.      Voting ............................................................................... 51

C.      Acceptance ....................................................................... 52

D.      Confirmation of the Plan .................................................... 52

1.      Best Interests of Holders of Claims and Interests .................... 54

2.      Feasibility ........................................................................... 56

3.      Acceptance by Impaired Classes ........................................... 57

4.      Cram Down ......................................................................... 58

5.      Classification of Claims ........................................................ 59

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED ...................... 59

A.      Financing Risks ................................................................. 59

B.      Risk of Non-Confirmation or Withdrawal of the Plan ........... 59

C.      Non-Consensual Confirmation of the Plan ........................... 60

D.      Alternatives to the Plan ...................................................... 60

VIII.   SECURITIES LAW MATTERS ..................................................... 61

A.      General ............................................................................. 61

B.      Issuance of New Stock ....................................................... 61

C.      Resale of New Common Stock ............................................ 61

IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............. 62

A.      United States Federal Income Tax Consequences to Debtor ... 62

1.      Cancellation of Indebtedness Income ..................................... 62

2.      General Section 382 Annual Limitation ................................. 63

B.      United States Federal Income Tax Consequences to Holders of Claims ............................................................................. 64

1.      Distributions in Discharge of Accrued Interest ....................... 64

      2.     Character of Gain or Loss; Tax Basis; Holding Period .............. 65

      3.     Limitation on Use of Capital Losses .......................................... 65

      4.     Information Reporting and Backup Withholding ....................... 66

X.      CONCLUSION ................................................................................... 67

**Exhibit A**:  Chapter 11 Plan of Reorganization

**Exhibit B**:  Schedule of Claims by Classes

**Exhibit C:**  Feasibility Projections

**Exhibit D:**  Liquidation Analysis

**DISCLAIMER**

THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE CHAPTER 11 PLAN OF REORGANIZATION FOR INGENU INC., A DELAWARE CORPORATION (THE "**DEBTOR**"), DATED October 30, 2020 (AS MAY BE AMENDED, THE "**PLAN**") PROPOSED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN AND APPLICABLE STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID IN AND TO SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS EXHIBIT A). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES,

CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 4:00 P.M. (PACIFIC TIME) ON December 1, 2020 (THE "**VOTING DEADLINE**"). TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY THE DEBTOR ON OR BEFORE THE VOTING DEADLINE. PLEASE SEE SECTION I.C OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS. BALLOTS MAY BE SUBMITTED VIA ELECTRONIC MAIL (BUT NOT VIA FACSIMILE).

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE

STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR ACCEPTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

414390-v2

# I.    INTRODUCTION

## A.    General

On July 27, 2020, (the "**Petition Date**") the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (the "**Bankruptcy Court**"). The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as Exhibit A. This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition and postpetition operations and finances and the Debtor's need to seek chapter 11 protection. This Disclosure Statement also describes the terms and conditions of the Plan, the Debtor's projections after the Effective Date of the Plan, potential alternatives to the Plan, certain effects of confirmation of the Plan and a description of the distributions proposed to be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that the holders of Claims and Interests entitled to vote must follow for their votes to be counted.

Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Plan unless the context requires otherwise.

## B.    Brief Summary of Plan[1]

The Plan provides for the reorganization of the Debtor through (i) a debt-for-equity exchange transaction whereby the Debtor's second most senior secured creditor, NDJR Grid Partners II, LLC ("**NDJR**"), will receive the equity in the Reorganized Debtor in exchange for the release of NDJR's pre-petition Secured

---

[1] This summary is intended to provide only a brief overview of the Plan. The terms of the Plan shall control over any description in this summary.

Claim (or, depending on the result of the Marketing Process (defined below), a portion thereof) and (ii) the funding by NDJR of an exit facility that the Reorganized Debtor will use to pay certain payments due in connection with the confirmation of the Plan. . The Plan treats Secured Claims that are junior to the Pre-Petition Second Lien Claim held by NDJR (Class 3)—specifically the Grid Secured Claim (Class 4), LFT Secured Claim Class 5), JBJK Secured Claim (Class 6), Gilbert Trust Secured Claim (Class 7), Trilliant Secured Claim (Class 8) and Other Secured Claims Class 10)—as Unsecured Claims (Class 11) on the grounds that the allowed amount of the Pre-Petition Second Lien Claim exceeds the aggregate value of the Debtor's assets. Such treatment is dependent on the Court determining, pursuant to the motion being separately filed by the Debtor pursuant to Section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, that the secured claims of each of the Grid Secured Claim (Class 4), LFT Secured Claim Class 5), JBJK Secured Claim (Class 6), Gilbert Trust Secured Claim (Class 7), Trilliant Secured Claim (Class 8) and Other Secured Claims Class 10) are all valued at zero dollars ($0) (the 'Lien Stripping Motion').

Pursuant to the Plan, all Allowed Claims in Classes 1 (Priority Claims) and Class 9 (Secured Tax Claims) will be paid in full in accordance with the Bankruptcy Code. The Allowed Claim in Class 2 (Pre-Petition First Lien Claim) will be paid the full amount of the principal amount of the underlying loan in accordance with the terms and provisions of the Plan. NDJR as the holder of the Allowed Claim in Class 3 (Pre-Petition Second Lien Claim) will (depending on the results of the Marketing Process) (i) receive New Common Stock in the Reorganized Debtor on account of all of the Pre-Petition Second Lien Claim or a portion thereof that equals the Settled Pre-Petition Second Lien Debt Amount and (ii) retain its Claim to the extent of the portion of the Pre-Petition Second Lien Claim that equals the Non-Settled Pre-Petition Second Lien Debt Amount subject to an extension of the maturity date to the fifth (5th) anniversary of the Effective Date. Subject to the Court's determination of the Lien Stripping Motion, all Allowed Claims in Class 4 (Grid Secured Claim), 5 (LFT

Secured Claim), 6 (JBJK Secured Claim), 7 (Gilbert Trust Secured Claim), 8 (Trilliant Secured Claim) and 10 (Other Secured Claims) are deemed Unsecured Claims and will receive the treatment provided to Allowed General Unsecured Claims.

The holders of Allowed General Unsecured Claims in Class 11 will receive Pro Rata distributions from the Creditors Account to be funded by the Reorganized Debtor after the Effective Date during the Measuring Period from the Tax Benefit generated during the Measuring Period in annual payments not to exceed in the aggregate the lesser of (i) $500,000 and (ii) twenty percent (20%) of the aggregate actual Tax Benefit for the Measuring Period; provided, however, the amount of any annual payment shall not exceed $100,000 for any year during the Measuring Period. "**Tax Benefit**" is defined in the Plan as "any reduction in any liability for income taxes of the Reorganized Debtor and any subsidiaries for a taxable period beginning after December 31, 2020 as a result of any net operating loss carry forward arising in a taxable period ending on or before December 31, 2020 as reduced by any taxable income recognized by the Reorganized Debtor or any subsidiaries to the extent attributable to the Plan (the "**NOL**")." Per the Plan, the Tax Benefit will be computed "annually by comparing (i) the actual federal, state and local income tax liability of the Reorganized Debtor for any taxable year during the Measuring Period in which it is able to utilize any such NOL to reduce its taxable income, to (ii) the amount of such income taxes that the Reorganized Debtor would have been required to pay with respect to such taxable year in the absence of such NOL. For purposes of the preceding sentence, any gross income recognized by the Reorganized Debtor as a result of any debt discharged in connection with this Plan shall not be taken into account in determining the Reorganized Debtor's taxable income for the relevant taxable year and, for the avoidance of doubt, any NOL utilized in the relevant taxable year shall be deemed to be the last deduction taken into account in such taxable year." As set forth in the Plan, the "foregoing annual payments will be funded into the Creditors Account within one hundred and twenty (120) days following the end of each taxable

414390-v2    DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION

period beginning after December 31, 2020 and will continue until the earlier of: (i) the expiration of the applicable carryforward period of the NOL with respect to any such taxable period; (ii) December 31, 2025; or (iii) the date the aggregate payments funded into the Creditors Account is $500,000 (the "**Measuring Period**")."

As to Class 12 (Interests), holders of Interests in the Debtor will receiving nothing on account of such Interests and such Interests will be cancelled.

Following the Effective Date of the Plan, the Debtor plans to continue to operate its business in an effort to grow it beyond the current 'proof of concept' stage, into revenue generating and ultimately profitability, and as such will be entitled to a discharge pursuant to Bankruptcy Code section 1141(d)(1).

## C. Voting Instructions and Procedures

### 1. Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Interests that are Impaired under the Plan, each holder of an Allowed Claim or Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan). Each Ballot is designated by Class number and such designation will indicate to holders of Claim(s) and Interest(s) the Class(es) in which they are entitled to vote.

Under the Plan, all holders of Claims or Interests in Classes 2 through 8 and Classes 10 through 11 (the "**Voting Classes**") are Impaired and entitled to vote on the Plan. Holders of Claims in Classes 1 and 9 (the "**Non-Voting Classes**") are Unimpaired under the Plan and are deemed to have accepted the Plan. Accordingly, holders of Claims in Classes 1 and 9 are not entitled to vote on the Plan. Holders of Interests in Class 12 are not receiving or retaining any property under the Plan on account of such Interests and, therefore are deemed to have rejected the Plan. Accordingly, they will not be entitled to vote on the Plan.

Only persons who hold Claims or Interests on the Record Date (defined in the Plan and summarized below) are entitled to receive a copy of this Disclosure Statement. Only persons who hold Claims or Interests in the Voting Classes on the Record Date are entitled to vote on whether to accept or reject the Plan. Attached as Exhibit B hereto is a schedule of the various classes and their respective members.

PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT. In order for a Ballot to be counted, it must be completed, signed and sent to the Debtor (through its counsel) **so as to be received by the Voting Deadline (4:00 p.m. Pacific Time on December 1, 2020)** at the following address:

Sullivan Hill Rez & Engel
600 B Street, 17th Floor
San Diego, CA 92101
Attn: Laurel Dinkins
Email: dinkins@sullivanhill.com
Telephone: (619) 595-3258

If you are a holder of a Claim or Interest in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

Sullivan Hill Rez & Engel, APLC
600 B Street, 17th Floor
San Diego, CA 92101
Attn: Laurel Dinkins
Email: dinkins@sullivanhill.com
Telephone: (619) 595-3258

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY THE DEBTOR PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING

DEADLINE WILL NOT BE COUNTED. BALLOTS MAY BE SENT BY ELECTRONIC MAIL (BUT NOT FACSIMILE). The Debtor will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed and satisfied. *See* Section VI.D.4, *infra* ("Cram Down").

### 2.    Voting Record Date

The record date for voting on the Plan is the date the Bankruptcy Court enters an order approving this Disclosure Statement.

### 3.    Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan. Upon receipt of a defective ballot, the Debtor will promptly notify the party submitting such ballot.

### 4.    Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, the Debtor may reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

The Debtor reserves the right to reject any and all Ballots not in proper form. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Upon receipt of a defective ballot, the Debtor will promptly notify the party submitting such ballot.

### 5.    Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline except as may be otherwise ordered by the Bankruptcy Court. Prior to the Voting Deadline, any holder of a Claim or Interest who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Debtor so as to be received by the Debtor's counsel at the address specified above before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the Claim and/or Interest to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by the Debtor's counsel by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the foregoing procedure. Prior to the Voting Deadline, any holder of a Claim and/or Interest who has delivered a valid Ballot may change its vote by delivering to the Debtor (through its counsel at the address above) a properly completed substitute Ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed Ballot for the same Claim(s) and/or Interest(s) (as applicable) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted. After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn

with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

### D.   Confirmation Hearing

The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "**Confirmation Hearing**") commencing at 9:00 a.m. Pacific time on December 15, 2020, before the Honorable Laura S. Taylor, United States Bankruptcy Judge for the Southern District of California, 325 West F Street, Courtroom 129 (Dept. 3), San Diego, CA 92101, subject to further order of the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

## II.   CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILING

### A.   The Debtor's Business

The Debtor is a Delaware corporation formed in 2008 (originally under the name On-Ramp Wireless, Inc.). The Debtor maintained its principal place of business in San Diego, California. The Debtor was formed to develop telecommunication networks between utility meters (water and electric) and the utilities' corporate

headquarters. Its innovative technology, built on Internet of Things connectivity, allows customers monitoring capabilities to better serve their communities. At its high point, the Debtor operated 38 networks in the United States, Latin America, Europe, and Asia; it employed approximately 150 people; and it generated approximately $8,000,000 in annual revenue.

Although the Debtor's business grew, it never did achieve consistent profitability sufficient to cover the costs associated with its operations and growth, and the Debtor remained dependent on continued financing from its investors. Beginning with its inception, the Debtor underwent several rounds of funding, pursuant to which it issued its investors common and preferred stock and convertible and other promissory notes. The Debtor initially raised several million dollars from its investors. In addition, in 2011, the Debtor obtained a business loan, including credit cards and letters of credit, from Silicon Valley Bank ("**SVB**") in an amount at the time not to exceed $1 million.

### B.   The Debtor's Bankruptcy Filing

The Debtor's financial difficulties were compounded in or around 2015, when the Debtor undertook misguided efforts to move beyond its core business and expand into "machine-to-machine" communication. The Debtor developed the network capacity to provide this type of communication, but was unable to attract customers for it–despite debt and equity holders having invested more than $150,000,000. The Debtor ultimately ran out of funding in late 2017 and early 2018, and its business essentially collapsed.

In addition, several parties have commenced litigation against the Debtor, and the litigation in a few cases has led to a judgment or default judgment against the Debtor. Faced with a mounting number of lawsuits, lack of liquidity and disinclination on the part of investors to extend further credit, the Debtor had no alternative but to

seek bankruptcy protection. Accordingly, the Debtor filed for bankruptcy relief on the Petition Date.

At present, the Debtor is essentially a startup once again.  Its operations are currently limited to three small networks that are in the 'proof of concept' stage and generate modest amounts from customers.  The Debtor also licenses its technology, although some of the licensees have been terminated recently for nonpayment of the fees owed to the Debtor.  Year-to-date revenue is less than $100,000 and the Debtor remains dependent on financing. These minimal operations are performed by two full-time independent contractors, as well as six part-time independent contractors (previously the Debtor's engineers) who are used on an "as-needed" basis.

### C.    Summary of Prepetition Secured Indebtedness

**(a) SVB:**

On or about September 21, 2011, the Debtor and SVB entered into that certain Loan and Security Agreement, pursuant to which SVB extended credit and other financial accommodations to the Debtor and the Debtor granted SVB security interest in its assets in accordance therewith. Pursuant to the loan agreement, the Debtor granted SVB a security interest in all of the Debtor's assets other than intellectual property except that the collateral included proceeds of the intellectual property. SVB's interest was acquired by Lakefront Associates, LLC ("**Lakefront**") prior to the Petition Date. Lakefront is an affiliate of NDJR (discussed below). Lakefront's lien is in first priority, senior to all other prepetition liens against the Debtor.

**(b) NDJR:**

NDJR is one of the largest secured creditors of the Debtor, whose lien is junior only to Lakefront's lien. The Debtor's indebtedness owed to NDJR is owed pursuant to a certain Secured Senior Subordinated Convertible Promissory Note dated June 27, 2017 (the "**NDJR Note**").  The aggregate principal amount outstanding under the NDJR Note is over $16 million. NDJR holds a lien and security interest in all of the Debtor's assets.

**(c)    Grid, LFT, & JBJK:**

The Debtor is indebted to Grid Partners IIIA, L.P. ("**Grid**"), LFT Capital, LLC ("**LFT**") and JBJK Investments, LP ("**JBJK**") in the approximate amount of $17.9 million, $3.8 million and $2.3 million, respectively, pursuant to Subordinated Secured Convertible Notes issued by the Debtor.  NDJR, Grid, LFT and JBJK are parties to an Intercreditor and Subordination Agreement they entered into on June 27, 2017 to govern the respective rights, interests, obligations priority and positions of those parties with respect to the assets and properties of the Debtor. Grid is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

**(d) Gilbert Trust:**

The Debtor is indebted to John S. Gilbert and Barbara J. Gilbert, trustees of the Gilbert Family Trust, dated March 1, 1993 (the "**Gilbert Trust**") in the approximate amount of $1.2 million pursuant to a promissory note issued by the Debtor.

**(e) Trilliant:**

Trilliant Networks (Canada) Inc. ("**Trilliant**") contends that it is owed approximately $2.8 million pursuant to promissory notes issued by the Debtor, which amount the Debtor contends is subject to setoff based on Trilliant's failure to complete additional contractual notes, purchases, and damages caused to the Debtor's business by Trilliant breaching the Trillian Contract.  Trilliant disputes such alleged set off claim.

## III.    EVENTS DURING THE CHAPTER 11 CASE

No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. The following is a brief description of some of the major events during the Chapter 11 Case:

### A.    DIP Financing

On July 28, 2020, the Debtor filed a motion seeking Court approval to obtain from NDJR in its capacity as the DIP Lender postpetition financing in the amount of $400,000, to grant the DIP Lender a "priming lien" in all of the Debtor assets, and

related relief. Given the Debtor's total lack of liquidity, this loan was necessary to finance the Debtor's continued operations throughout the case, as well as the costs of administration.  On July 31, 2020, the Court entered an order approving the financing on an interim basis. On August 20, 2020, the Court entered a final order approving the financing on a final basis.

### B.    Retention of Counsel

On July 31, 2020, the Debtor filed an application to employ Sullivan Hill Rez & Engel, APLC as its general bankruptcy counsel. On August 21, 2020, the Court entered an order approving the application.

On August 18, 2020, the Debtor filed an application to employ Shustak Reynolds & Partners, P.C. as its special intellectual property counsel. On September 9, 2020, the Court entered an order approving the application.

### C.    Retention of Sherwood and Marketing Process

On August 11, 2020, the Debtor filed a motion to approve a process ("Marketing Process") for the Debtor's assets, as well as the retention of Sherwood Partners, Inc. to run the Marketing Process. The motion is currently set for hearing on September 24, 2020.

### D.    Claims Bar Date

On July 29, 2020, the Bankruptcy Court entered on the docket and served on all creditors and parties in interest a Notice of Chapter 11 Case which, among other things, set the general claims bar date for October 5, 2020 and the governmental claims bar date for January 25, 2021.

## IV.    SUMMARY OF THE PLAN

### A.    Introduction

Set forth in this Article is a description of the basic terms of the Plan. This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as <u>Exhibit A</u>.

## B.    Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim. The Debtor believes that the Plan complies with this standard. The Plan divides Claims against and Interests in the Debtor into the following Classes:

**Class 1 (Priority Non-Tax Claims)** shall consist of all Priority Non-Tax Claims.

**Class 2 (Pre-Petition First Lien Claim)** shall consist of the Claim of the Pre-Petition First Lien Lender under its Pre-Petition Senior Loan Documents.

**Class 3 (Pre-Petition Second Lien Claim)** shall consist of the Claim of the Pre-Petition Second Lien Lender under its Pre-Petition Senior Loan Documents.

**Class 4 (Grid Secured Claim)** shall consist of the Grid Secured Claim, i.e., the Claim of Grid under the Grid Subordinated Secured Notes.

**Class 5 (LFT Secured Claim)** shall consist of the Claim of the LFT Secured Claim, i.e., the LFT under the LFT Subordinated Secured Notes.

**Class 6 (JBJK Secured Claim)** shall consist of the JBJK Secured Claim, i.e., the Claim of JBJK under the JBJK Subordinated Secured Notes.

**Class 7 (Gilbert Trust Secured Claim)** shall consist of the Claim of the Gilbert Trust Secured Claim, i.e., the Gilbert Trust under the Gilbert Trust Subordinated Secured Note.

**Class 8 (Trilliant Secured Claim)** shall consist of the Trilliant Secured Claim, i.e., the Claim of Trilliant under the Trilliant Subordinated Secured Notes.

**Class 9 (Secured Tax Claims)** shall consist of all Secured Tax Claims.

**Class 10 (Other Secured Claims)** shall consist of all Other Secured Claims.

**Class 11 (General Unsecured Claims)** shall consist of all General Unsecured Claims against the Debtor.

**Class 12 (Interests)** shall consist of all Interests in the Debtor.

For a listing of claimants by class, see Exhibit B hereto.

For a description of the treatment of the Claims and Interests under the Plan, see Article V of the Plan, "Treatment of Claims and Interests."

A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is a Claim or Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

**C.    Treatment of Claims and Interests and Summary of Distributions under the Plan**

The Confirmation Order shall provide for the vesting of the Debtor's assets in the Reorganized Debtor. Pursuant to the terms of the Plan, the Reorganized Debtor, either itself or through a Disbursing Agent, will, among other things, calculate and pay all distributions required or permitted under the Plan.

**1.    Administrative Claims**

**a.    Allowed Administrative Expense Claims**

Subject to the provisions contained in Section 2.2 of the Plan, unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Administrative Expense Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) for Ordinary Course Administrative Expense Claims, when such Claims are due and payable in the ordinary course of the Debtor's business,

(c) thirty (30) days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and (d) the date the Reorganized Debtor is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto.

### b.    Requests for Allowance of Administrative Expense Claims

Except as expressly set forth to the contrary in the Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following Subsections:

**(1)    Professionals.** All Professionals shall file a final application for the allowance of a Professional Fee Claim on or before forty (40) days following the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor, counsel for the Committee, the UST and the requesting Professional no later than twenty (20) days after the filing of the applicable application for allowance of the Professional Fee Claim.

**(2)    Other Administrative Expense Claimants.** All holders of Administrative Expense Claims other than Professionals shall file a request for payment of an Administrative Expense Claim with the Bankruptcy Court on or before forty (40) days following the Effective Date. Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request for payment by such deadline shall be forever barred from asserting such Claims against the Debtor, the Reorganized Debtor or their respective property and assets (whether cash or otherwise). Notwithstanding the foregoing, holders of Ordinary Course Administrative Expense Claims do not need to file with the Bankruptcy Court a request for payment of an Administrative Expense Claim, but rather may be paid in the ordinary course.

### 2. Allowed Priority Tax Claims

Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Priority Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall be paid a value, as of the Effective Date, equal to the unpaid portion of such Allowed Priority Tax Claim in equal quarterly cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.

### a. Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 2.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code. Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to treatment in Class 12 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

### 3. DIP Facility Claims

The DIP Facility Claims shall be deemed to be an Allowed Claim including all principal, accrued and accruing postpetition interest, costs, fees and expenses. In full and final satisfaction, settlement, release, and discharge of the Allowed DIP Facility Claims, and except to the extent the DIP Lender agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, the DIP Facility Claims shall be paid full in Cash by the Reorganized Debtor with proceeds from the Exit Facility.

### 4. Summary of Classification and Treatment of Holders of Allowed Claims and Interests that are Placed in Classes

The following table sets forth a brief summary of the classification and treatment of Claims and Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan. The information set forth in the tables is for convenience of reference only. Each holder of a Claim or Interest should refer to Article V of the Plan, "Treatment of Classes of Claims and Interests," for a full understanding of the classification and treatment of Claims and Interests provided under the Plan.  The estimated amounts of the Claims reflected below are as of the Petition Date, and do not include Claims which are contingent, disputed or unliquidated.

In addition to having senior lien priority over that of Grid, Gilbert Trust and Trilliant based on filing a UCC-1 financing statement prior to those filed by such parties, NDJR obtained lien priority over Grid, LFT, and JBJK by virtue of an Intercreditor and Subordination Agreement entered into by those parties on June 27, 2017.

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 1 (Priority Non-Tax Claims):** Consists of all Priority Non-Tax Claims. Estimated Aggregate Claims Amount: $0 | Unimpaired. Unless otherwise agreed in writing by the Reorganized Debtor and the holder of an Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim will receive an amount equal to its Allowed Priority Non-Tax Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim by the entry of a Final Order, and (c) the date the Reorganized Debtor is |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| | otherwise obligated to pay such Allowed Priority Non-Tax Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto. |
| **Class 2 (Pre-Petition First Lien Claim):** Consists of the Pre-Petition First Lien Claim. Estimated Claim Amount: $86,366.69 (plus accrued interest and costs and fees owed) | Impaired. On the Effective Date or as soon thereafter as is practicable, the holder of the Allowed Pre-Petition First Lien Claim shall receive the following treatment: the amount of the Allowed Pre-Petition First Lien Claim shall be reduced to the principal amount portion of the Pre-Petition First Lien Claim in the amount equal to $86,366.69 on account of outstanding obligations as of the Petition Date. The Reorganized Debtor shall pay such amount in Cash to the Pre-Petition First Lien Lender from the proceeds of the Exit Facility, with any balance of such Claim on account of the amount of all other Obligations under, and as defined in, the Pre-Petition First Lien Loan Agreement including, without limitation, accrued and unpaid interest at the contract rate set forth in the Pre-Petition First Lien Loan Agreement through and including the Effective Date and |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| | the reasonable fees and expenses of counsel for the Pre-Petition First Lien Lender, to be discharged. |
| **Class 3 (Pre-Petition Second Lien Claim)** Consists of the Pre-Petition Second Lien Claim. Estimated Claim Amount: $16,273,098.82 (plus any accrued interest and costs and fees owed) | Impaired. On the Effective Date, the holder of the Allowed Pre-Petition Second Lien Claim shall receive the following treatment: (i) the portion of the Pre-Petition Second Lien Claim equal to the Settled Pre-Petition Second Lien Debt Amount shall be fully and finally satisfied, settled, released and discharged through the receipt by the Pre-Petition Second Lien Lender of the New Common Stock in the Reorganized Debtor pursuant to the Debt-For-Equity Exchange as provided for in the Plan, and (ii) with respect to the Non-Settled Pre-Petition Second Lien Debt Amount, the holder of the Pre-Petition Second Lien Claim shall retain such Claim to the extent of such amount and the Reorganized Debtor shall continue to be liable for such Claim to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount in accordance with the Pre-Petition Senior Loan Documents governing the Pre-Petition Second Lien Claim (as may be modified by the holder of the Pre-Petition Second Lien Claim and the |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| | Reorganized Debtor), subject to the following: (i) the maturity date for the repayment of the Non-Settled Pre-Petition Second Lien Debt Amount shall be the fifth (5th) anniversary of the Effective Date; (ii) interest shall accrue on the principal amount of such Claim at the non-default rate of six and a half percent (6.5%) per annum which interest, rather than being paid in Cash, may be (at the option of the Reorganized Debtor) capitalized and added to the principal amount of the Claim; (iii) the holder of the Pre-Petition Second Lien Claim shall retain its Liens securing such Claims to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount; and (iv) any defaults that existed with respect to such Claim as of the Petition Date shall be deemed cured. |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 4 (Grid Secured Claim):** Consists of the Grid Secured Claim.<br><br>Estimated Claim Amount: $17,879,194.64 | Impaired. Subject to the Court's determination of the Lien Stripping Motion, the Class 4 Grid Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |
| **Class 5 (LFT Secured Claim):** Consists of the LFT Secured Claim.<br><br>Estimated Claim Amount: $2,301,046.58 | Impaired. Subject to the Court's determination of the Lien Stripping Motion, the Class 5 LFT Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |

Case No. 20-03779-LT11
DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 6 (JBJK Secured Claim):** Consists of the JBJK Secured Claim. Estimated Claim Amount: $3,769,777.40 | Impaired. Subject to the Court's determination of the Lien Stripping Motion, the Class 6 JBJK Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |
| **Class 7 (Gilbert Trust Secured Claim):** Consists of the Gilbert Trust Secured Claim. Estimated Claim Amount: $1,153,424.66 | Impaired. Subject to the Court's determination of the Lien Stripping Motion, the Class 7 Gilbert Trust Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 8 (Trilliant Secured Claim):** Consists of the Trilliant Secured Claim.<br><br>Estimated Claim Amount: $2,736,376.71 (subject to potential setoff) | Impaired. Subject to the Court's determination of the Lien Stripping Motion, the Class 8 Trilliant Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |
| **Class 9 (Secured Tax Claims):** Consists of the Secured Tax Claims.<br><br>Estimated Aggregate Claims Amount: $258,488.09 | Unimpaired. Pursuant to § 1129(a)(9)(D) of the Bankruptcy Code, each holder of an Allowed Class 9 Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim and shall be paid a value as of the Effective Date equal to the unpaid portion of such Allowed Secured Tax Claim in quarterly Cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date. |

414390-v2

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 10 (Other Secured Claims):** Consists of the Other Secured Claims. Estimated Aggregate Claims Amount: $250,934.91 | Impaired. Subject to the Court's determination of the Lien Stripping Motion, each Class 10 Other Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
|---|---|
| **Class 11 (General Unsecured Claims):** Consists of the General Unsecured Claims.<br>Estimated Aggregate Claims Amount: $9,213,525.49 | Impaired. Each holder of an Allowed Class 11 General Unsecured Claim shall receive, on account of such Allow Claim, distributions from the Creditors Account on a Pro Rata basis. In the event that the Debtor does not achieve profitability within the five-year Measuring Period, then no Tax Benefit will be realized by the Debtor; the Debtor will have no obligation to fund the Creditors Account; and holders of Class 11 claims will receive no distributions under the Plan.  No interest, penalty, or late charge is to be allowed on any Claim for the purpose of computing the distributions to the holders of Allowed General Unsecured Claims. For each year during the Measuring period, the Debtor will either (i) make distributions required under the Plan, or (ii) if no distributions are required under the Plan, provide notice of that fact to all holder of Claims in Class 11 who file in the Chapter 11 Case and serve on the Debtor or the Reorganized Debtor, as applicable, a request for notice, no later than December 31 of the following year. |

| DESCRIPTION AND AMOUNT OF CLAIMS | TREATMENT |
| --- | --- |
| **Class 12 (Interests)**: Consists of all Interests in the Debtor. | Impaired. Holders of Class 12 Interests shall receive nothing on account of and in exchange for such Interests. |

### D.    Means for Execution of the Plan

#### 1.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor

As of the Effective Date, the Reorganized Debtor shall exist as a corporate entity in accordance with applicable law pursuant to its Amended Certificate of Incorporation and Bylaws.  Except as otherwise provided in the Plan, on and after the Effective Date, all Property of the Estate, including all claims, rights and Causes of Action, shall vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of Property and compromise or settle any Claims without supervision of or approval of the Bankruptcy Court free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

Following the Effective Date of the Plan, the Debtor plans to continue to operate its business in an effort to grow it beyond the current 'proof of concept' stage,

into revenue generating and ultimately profitability, and as such will be entitled to a discharge pursuant to Bankruptcy Code section 1141(d)(1).

### 2.    Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of the Debtor or the Reorganized Debtor.

### 3.    Certificate of Incorporation and Bylaws

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtor shall file with the Secretary of State of the State of Delaware, in accordance with the Delaware General Corporation Law, the Amended Certificate of Incorporation and Bylaws.  The Amended Certificate of Incorporation and Bylaws shall become the Amended Certificate of Incorporation and Bylaws of the Reorganized Debtor.  The Amended Certificate of Incorporation and Bylaws for the Reorganized Debtor shall be included in the Plan Supplement.

### 4.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and upon payment as provided in the Plan, all mortgages, deeds of trust, Liens or other security interests against the property of the Estate vesting in the Reorganized Debtor will be fully released and discharged.  The Reorganized Debtor shall be authorized to file or record on behalf of creditors such Uniform Commercial Code termination statements, real property releases or reconveyances, or other documents or instruments as may be necessary to implement the provisions of Section 6.4 of the Plan.  For the avoidance of doubt, the Pre-Petition Second Lien

Claim to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount are not released under the Plan.

**5.      Cancellation of Interests and Authorization and Issuance of New Stock**

**a.**      On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New Common Stock to be distributed to NDJR pursuant to the Plan without any further act or action by any other party under applicable law, regulation, order or rule.  The issuance of the New Common Stock and the distribution thereof under the Plan shall be exempt from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws.  All documents, agreements and instruments entered into, on or as of the Effective Date contemplated by or in furtherance of the Plan, including the Exit Financing Agreement and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

**b.**      All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

**6.      The Exit Facility**

a.      On the Effective Date and simultaneously with the vesting of the Debtor's assets in the Reorganized Debtor, the Reorganized Debtor shall enter into the Exit Financing Agreement with the Exit Facility Lender and any related documents required by the Exit Facility Lender. Confirmation of the Plan shall be deemed to constitute approval of the Exit Facility and the Exit Facility documents and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtor to enter into and perform its obligations in connection with the Exit Facility without the need for any further action.

414390-v2

b.     The main terms of the Exit Facility shall be as of the Effective Date as follows:

        i.     A multiple draw term loan in the principal amount of the Exit Facility Amount.

        ii.     The maturity date of the Exit Facility shall be the fifth (5th) anniversary of the Effective Date.

        iii.     The non-default interest rate shall be five percent (5%) per annum, and the default rate shall accrue upon the occurrence of an event of default thereunder at the rate of seven percent (7%) per annum.

        iv.     The Exit Facility shall be secured by first priority Liens on, and security interests in, all of the Reorganized Debtor's right, title and interest, both legal and equitable, in real and personal property, tangible and intangible, wherever located and however acquired, subject to the terms of the Exit Facility documents.

c.     On the Effective Date, the Exit Facility documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor and the non-Debtor parties to the Exit Facility documents, enforceable in accordance with their terms.  Pursuant to the Plan, the financial accommodations to be extended pursuant to the Exit Facility documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

d.     The Liens securing the Reorganized Debtor's obligations under the Exit Facility shall constitute first priority perfected liens and security

interests on all of the tangible, real and personal, assets of Reorganized Debtor to the extent provided in the Exit Facility documents (subject to only the Liens securing the Non-Settled Pre-Petition Second Lien Debt Amount).  On the Effective Date, all of the Liens securing the Exit Facility (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

e.      The Reorganized Debtor and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**7.      Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor**

**a.      Board of Directors.** As of the Effective Date, the Board of Directors shall be the governing body of the Reorganized Debtor until such time as a shareholders' meeting occurs pursuant to the Organizational Documents or applicable non-bankruptcy law, and shall assume the governance of the Reorganized Debtor including, but not limited to, determining who shall serve as the Reorganized Debtor's Officers, supervisors, managers and executive employees.

**b.      Identity of Board of Directors.** On the Effective Date, the term of the current members of the board of directors of the Debtor, if any, will expire. The identity of the initial members of the Board of Directors shall be included in the Plan Supplement.

**c.      Other Provisions.** Other provisions governing the service, term and continuance in office of the members of the Board of Directors shall be set forth in the Organizational Documents of the Reorganized Debtor.

### 8.      Disbursing Agent

On the Effective Date, the Reorganized Debtor shall have the authority to serve as, or appoint, the Disbursing Agent to carry out the duties set forth in the Plan.  The Reorganized Debtor shall have the authority to replace the Disbursing Agent at any time, with or without cause, subject to the terms of any agreement between the Reorganized Debtor and the Disbursing Agent.  The Reorganized Debtor shall file any agreement with the Disbursing Agent with the Bankruptcy Court and serve such agreement on the United States Trustee.

### 9.      Closing of Case

If, after the Effective Date, the Chapter 11 Case is closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of the Plan, (b) shall not affect any rights of the Debtor, the holders of Claims or Interests or the treatment of any other Person under the Plan, (c) shall continue to cause the terms of the Plan to remain binding on all Persons, (d) shall cause all orders of the Bankruptcy Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article XII of the Plan.

### 10.      Effectuating Documents; Further Transactions

The chief executive officer, the chief financial officer, chairman of the Debtor's board of directors or any other executive officer of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate

and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the Debtor shall be authorized to certify or attest to any of the foregoing actions.

### 11.    Withholding and Reporting Requirements

In connection with the Plan, the Reorganized Debtor shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) be authorized to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to the Plan.

### 12.    Quarterly Reports and United States Trustee's Fees

The Reorganized Debtor shall have the obligation to file quarterly reports in the format prescribed by the United States Trustee and pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) which obligation shall end upon entry of a final decree or other order Closing the Chapter 11 Case.

### 13.    Preservation of Causes of Action

**a.    Vesting of Causes of Action.** In accordance with § 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all claims and Causes of Action held by the Debtor and/or the Estate, whether arising before or after the Petition Date.  All such claims and Causes of Action, along with all rights, interests and defenses related thereto, shall vest with the Reorganized Debtor.

**b.    Reservation of Causes of Action.** Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, and except as to the Pre-Petition

Senior Lenders, the Debtor and the Reorganized Debtor specifically reserve all Causes of Action, for later adjudication.  Therefore, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the Causes of Action upon, after or as a consequence of the confirmation, the Effective Date or consummation of the Plan.  Without limiting the foregoing, the Causes of Action reserved under the Plan include the Causes of Action disclosed in the Debtor's Schedules against (i) Trilliant (breach of contract regarding license agreement; breach of contract for failure to purchase promissory notes pursuant to its letter agreement with the Debtor to purchase promissory notes issued by the Debtor); (ii) Vula Telematix (Pty) Ltd. (nonpayment for 3 years, breach of contract, damages in the amount of $41,000); (iii) rpmaNetworks aka MEC Telematik FZ LLC corporation (unpaid licenses, breach of contract, damages in the amount of $8 million); (iv) Wuxi Jiuzhou Communications Technology Co., Ltd (nonpayment, breach of contract, damages in the amount of $384,754); (v) Totum Labs (https://totumlabs.com/) for patent infringement and (vi) the Debtor's former officers and directors, including John Horn and Ted Myers, for breaches of fiduciary duties, negligence, misappropriation and related claims; (vi) RPMA International Corp (triggered escrow release without cause and nonpayment, breach of contract, damages in the amount of $7,808); (vii) JBJK (breach of contract for failure to purchase promissory notes pursuant to its note and warrant purchase agreement with the Debtor to purchase promissory notes issued by the Debtor) and (viii) LFT (breach of contract for failure to purchase promissory notes pursuant to its note and warrant purchase agreement with the Debtor to purchase promissory notes issued by the Debtor).  In addition, the Causes of Action reserved under the Plan included any Causes of Action regarding any transfers disclosed in the Debtor's s Statement of Financial Affairs ("**SOFA**"), including Avoidance Actions.

        **c.**      **Preservation of Defensive Use of Causes of Action.** Whether or not any Cause of Action is pursued or abandoned, the Debtor and the Reorganized Debtor reserve their rights to use any such Cause of Action defensively,

including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.

### d.    Discretion to Pursue or Settle

The Reorganized Debtor shall have discretion to pursue or not to pursue, to settle or not to settle, to try or not to try, and/or to appeal or not to appeal all Causes of Action.

### 14.    No Liability for Solicitation or Participation

As specified in § 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sales, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 15.    Exemption From Certain Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the Exit Facility liens and any transfer from a Debtor to a Reorganized Debtor or to any Person pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning of any contract, lease or sublease; (3) any transaction authorize by the

Plan; (4) any sale of an asset by the Reorganized Debtor in furtherance of the Plan, including but not limited to any sale of personal or real property and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan.

### E.    Distribution Provisions

#### 1.    Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Disbursing Agent pursuant to the terms and conditions contained in the Plan; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under § 502(d) of the Bankruptcy Code.

#### 2.    Distributions of Cash

All distributions of Cash to be made by the Disbursing Agent pursuant to the Plan shall be made by a check or wire transfer from the Disbursing Agent's account maintained in accordance with the Plan.

#### 3.    Effective Date and Subsequent Distributions

On or as soon as practicable after the Effective Date, the New Common Stock shall issue as described in the Plan. For the first year in which funds are deposited into the Creditors Account, the Disbursing Agent shall make the initial distributions as soon as practicable thereafter (the "**Initial Distribution Date**") to those entitled to distribution in accordance with the terms and provisions of the Plan. For each year thereafter, if and when funds are deposited in the Creditors Account for such year, the Disbursing Agent shall make distributions as soon as practicable thereafter (a "**Subsequent Distribution Date**") to those entitled to distribution in accordance with the terms and provisions of the Plan.

#### 4.    Delivery of Distributions and Undeliverable Distributions

Distributions to the holder of an Allowed Claim or Interest shall be made at the address of such holder as set forth on the Schedules unless superseded by the address

as set forth on the Proof of Claim filed by such holder or by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing within six months of the distribution date of such holder's then current address, at which time all distributions shall be made to such holder, without interest. All claims for undeliverable distributions shall be made within six months after the date such undeliverable distribution was initially made. If any claim for an undeliverable distribution is not timely made as provided herein, such claim shall be forever barred with prejudice. After such date, (a) all unclaimed property shall be applied first to satisfy the costs of administering and fully consummating the Plan, then shall be transferred to the Reorganized Debtor and available to be used for general corporate purposes, including working capital, and (b) the holder of any such Claim or Interest shall not be entitled to any other or further distribution under the Plan on account of such undeliverable distribution or such Claim or Interest.

### 5.    Time Bar to Cash Payments and Disallowances

Checks issued by the Disbursing Agent in respect of Allowed Clams shall be void if not negotiated within three months after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of three months following the date of issuance of such check. After such date, (a) all funds held on account of such void check shall be applied first to satisfy the costs of administering and fully consummating the Plan, then will be available to the Reorganized Debtor to be used for general corporate purposes, including working capital, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further distribution on account of such Claim.

### 6.    Minimum Distributions

If a distribution to be made to a holder of an Allowed Claim on any Distribution Date would be $25.00 or less, notwithstanding any contrary provision of the Plan, no distribution will be made to such Claimant. In addition, no fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.

### 7.    Transactions on Business Days

If the Effective Date or any other date on which a transaction, event or act may occur or arise under the Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by the Plan to occur on such day shall instead occur on the next day which is a Business Day.

### 8.    Distributions after Allowance

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed or estimated for distribution purposes, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

### 9.    Disputed Payments

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Disbursing Agent may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 10.    No Distributions in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

### 11.    Reservation of Claim Objections

Unless any objection to a Claim is expressly waived, relinquished, released, compromised or settled in the Plan or a Final Order, the Debtor and the Reorganized

Debtor specifically reserve all such objections, including without limitation objections to the amount or validity of any Claim. The Debtor has not yet completed its analysis into and investigation of the Claims and objections thereto. Accordingly, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any objection to any Claim upon, after or as a consequence of the confirmation, the Effective Date or consummation of the Plan.

### F.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases that exist between the Debtor and any Person shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed (including a motion seeking an order authorizing, but not directing, the Debtor to assume, assume and assign, or reject such Executory Contract or Unexpired Lease) prior to the Effective Date, (iii) agreed to be excluded from such rejection pursuant to stipulation with the Debtor or the Reorganized Debtor, or (iv) that is identified on the Plan Supplement as being excluded from rejection.  Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("**Rejection Claims**") shall be classified in Class 11 under the Plan. For the avoidance of doubt, the foregoing shall apply to the Trilliant Contract to the extent a determination is made that, contrary to the Debtor's position, the Debtor's termination of the Trilliant Contract prior to the Petition Date was not effective, in which case the Trilliant Contract shall either (1) be deemed rejected pursuant to the Plan, and Trilliant may assert continued rights in the Debtor's intellectual property under section 365(n) of the Bankruptcy Code, or (2) be the subject of continued litigation regarding whether

the Trilliant Contract is subject to termination as a result of pre-petition and continuing breaches, and the consequences of such termination. For further avoidance of doubt, (a) the Debtor asserts that it effectively terminated the Trilliant Contract prior to the Petition Date based on certain breaches by Trilliant (the 'Pre-Petition Termination'), and therefore, the Trilliant Contract is not an Executory Contract; (b) Trilliant contends that the purported Pre-Petition Termination was ineffective as the Trilliant Contract required a 60-day notice and cure period; (c) the Debtor contends that such notice and cure period was inapplicable as certain of Trilliant's breaches were and are incurable; (d) Trilliant disputes that such notice and cure period was inapplicable because certain of Trilliant's breaches were allegedly incurable; (e) Trilliant commenced Adversary Proceeding No. 20-90108 seeking a judicial determination of this and other related issues; (f) the Debtor reserves the right to assert that existing breaches, and/or other and further breaches, give rise to the right to terminate the Trilliant Contract even if the Pre-Petition Termination was not effective (the "Post-Petition Termination"); and (g) Trilliant reserves all rights to dispute such purported Post-Petition Termination.

### 2. Bar Date for Filing Rejection Claims

A Proof of Claim asserting a Rejection Claim shall be filed with the Bankruptcy Court on or before the fortieth (40th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Reorganized Debtor.

### G. Conditions Precedent to Effectiveness of the Plan

#### 1. Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.1 of the Plan:

a.    The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to the Debtor and the Exit Facility Lender, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, Section 10.1(a) of the Plan shall be deemed satisfied;

b.    All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Exit Facility Lender and the Debtor and shall have been effected or executed as applicable; and

c.    The Exit Facility Lender and the Debtor shall have executed the Exit Financing Agreement.

### 2.    Waiver of Conditions

The conditions set forth in Section 10.1 of the Plan may be waived by the Debtor and the Exit Facility Lender, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### H.    Modification of the Plan

The Debtor may propose amendments to or modifications of the Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order. After the Confirmation Date, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of Claimants are not materially and adversely affected.

### I.    Releases and Related Matters

### 1.    Releases by Holders of Claims for Post-Petition Conduct

-43-

As of the Effective Date, in consideration for the obligations of the Debtor and the Reorganized Debtor under the Plan and the cash and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce obligations under or reserved by the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder and the right to contest Professional Fee Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place after the Petition Date and through the Effective Date, in any way relating to the Debtor, the Chapter 11 Case or the Plan that such Person has, had or may have against (i) the Debtor, (ii) the Debtor's directors, officers, employees, agents and attorneys, (iii) the Committee and its agents, attorneys, and other professionals; (iv) the Pre-Petition Senior Lenders and their agents, attorneys, and other professionals; (v) the DIP Lender and its employees, agents, attorneys and other professionals and (vi) the Exit Facility Lender and its employees, agents, attorneys and other professionals.

## 2.    Releases by the Debtor

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and the Reorganized Debtor and any and all Persons claiming through or on behalf of the Debtor or the Reorganized Debtor including, without limitation, any Committee, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever in connection with or related

to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, other than for gross negligence or willful misconduct, in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case or the Plan, and that may be asserted by the Debtor or its Estate or the Reorganized Debtor against (i) the Debtor's directors, officers, employees, agents and attorneys; (ii) the DIP Lender and its employees, agents, attorneys and other professionals; (iii) the Committee and its agents, attorneys, and other professionals; (iv) the Pre-Petition Senior Lenders and their agents, attorneys, and other professionals; and (v) the Exit Facility Lender and its employees, agents, attorneys and other professionals.   The Debtor, the Reorganized Debtor, the Committee, the Pre-Petition Senior Lenders, and DIP Lender, and each of their respective agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts, and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided, however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

### 3.    Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or

liabilities released pursuant to the Plan, including pursuant to the releases in Section 13.3 of the Plan.

### J.    Dissolution of the Committee

On the Effective Date, any Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims. The Professionals retained by the Committee shall be entitled to compensation and reimbursement of (i) fees and expenses for services rendered through and including the date it is dissolved, and (ii) fees and expenses for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 2.2 of the Plan or any objections thereto.

### K.    Default

If the reorganized Debtor fails to make any payment, or to perform any other payment obligation required under the Plan, for more than thirty (30) days after the time specified in the Plan for such payment, any member of a Class affected by the default may serve upon the Reorganized Debtor a written notice of default. If the Reorganized Debtor fails within ninety (90) days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the court an extension of time to cure the default; or (iii) to obtain from the court a determination that no default occurred, then the Reorganized Debtor is in default with respect to such payment or obligation (a "**Material Default**") under the Plan. Notwithstanding the foregoing, a default or material default under the plan may be waived in writing by holders of more than 50% of the outstanding allowed amount of the affected Claim(s). Upon Material Default, such member of such Class affected by the default: (i) may file and serve a motion to dismiss the Chapter 11 Case or to convert the Chapter 11 Case to Chapter 7; or (ii) without further order of the court be deemed to have relief from stay to the

extent necessary, and may pursue its lawful remedies to enforce and collect Debtor's pre-confirmation obligations.

**L.     Effect of Confirmation of the Plan**

**1.     Discharge of the Debtor**

PURSUANT TO § 1141(D) OF THE BANKRUPTCY CODE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, THE RIGHTS AFFORDED AND THE PAYMENTS AND DISTRIBUTIONS TO BE MADE AND THE TREATMENT UNDER THE PLAN SHALL BE IN COMPLETE EXCHANGE FOR, AND IN FULL AND UNCONDITIONAL SETTLEMENT, SATISFACTION, DISCHARGE, AND RELEASE OF ANY AND ALL EXISTING DEBTS AND CLAIMS AND TERMINATION OF ALL INTERESTS OF ANY KIND, NATURE, OR DESCRIPTION WHATSOEVER AGAINST OR IN THE DEBTOR, THE REORGANIZED DEBTOR, THEIR PROPERTY, THE DEBTOR'S ASSETS, OR THE ESTATE, AND SHALL EFFECT A FULL AND COMPLETE RELEASE, DISCHARGE, AND TERMINATION OF ALL LIENS, SECURITY INTERESTS, OR OTHER CLAIMS, INTERESTS, OR ENCUMBRANCES UPON ALL OF THE DEBTOR'S ASSETS AND PROPERTY.   FURTHER, ALL PERSONS ARE PRECLUDED FROM ASSERTING, AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS, OR ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR INTERESTS BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE, OTHER THAN AS EXPRESSLY PROVIDED FOR IN THE PLAN, OR THE CONFIRMATION ORDER, WHETHER OR NOT (A) A PROOF OF CLAIM BASED UPON SUCH DEBT IS FILED OR DEEMED FILED UNDER § 501 OF THE BANKRUPTCY

CODE; (B) A CLAIM BASED UPON SUCH DEBT IS ALLOWED; OR (C) THE CLAIMANT BASED UPON SUCH DEBT HAS ACCEPTED THE PLAN.

### 2. Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL CLAIMANTS AND HOLDERS OF INTERESTS ARISING PRIOR TO THE EFFECTIVE DATE SHALL BE PERMANENTLY BARRED AND ENJOINED FROM ASSERTING AGAINST THE REORGANIZED DEBTOR OR THE DEBTOR, OR THEIR SUCCESSORS OR PROPERTY, OR THE DEBTOR'S ASSETS, ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH CLAIM OR INTEREST: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING ON ACCOUNT OF SUCH CLAIM AGAINST OR INTEREST IN THE REORGANIZED DEBTOR, THE DEBTOR, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN TO ENFORCE ANY RIGHT TO DISTRIBUTION WITH RESPECT TO SUCH PROPERTY UNDER THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTOR, THE DEBTOR OR ANY OF THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN AS PERMITTED UNDER SUB-PARAGRAPH (I) ABOVE; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST PROPERTY OF THE REORGANIZED DEBTOR, THE DEBTOR, OR ANY PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR, THE REORGANIZED DEBTOR, THEIR ASSETS OR ANY OTHER PROPERTY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY

DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN. THE FOREGOING DISCHARGE, RELEASE AND INJUNCTION ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION. THE DEBTOR AND THE REORGANIZED DEBTOR SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK THE ENFORCEMENT OF THE DISCHARGE, RELEASE AND INJUNCTION SET FORTH IN ARTICLE XI OF THE PLAN.

### 3.    No Waiver of Discharge

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtor upon confirmation of the Plan by § 1141 of the Bankruptcy Code.

### 4.    Binding Effect

As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and holders of Interests, other parties-in-interest and their respective heirs, successors, and assigns.

### 5.    Term of Injunctions or Stays

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time they are replaced with the injunction set forth in Section 11.1 of the Plan.

## V.    THE REORGANIZED DEBTOR

### A.    The Exit Financing

Pursuant to the Exit Financing Agreement, NDJR will provide the Reorganized Debtor with the Exit Facility upon the Effective Date of the Plan. The Exit Financing

Agreement for the Exit Facility shall be on the terms and conditions substantially similar to those of the DIP Credit Agreement and otherwise consistent with the terms set forth in Section 6.6 of the Plan.

### B.    Issuance of New Common Stock

Pursuant to the Debt-For-Equity Exchange described in the Plan, on the Effective Date, New Common Stock in the Reorganized Debtor will be issued to NDJR in exchange of the satisfaction of the portion of the Pre-Petition Second Lien Claim that equals the Settled Pre-Petition Second Lien Debt Amount.

### C.    Business and Property of the Reorganized Debtor

The Reorganized Debtor intends to continue to operate and develop the business the Debtor operated prior to the Petition Date.

### D.    Management of the Reorganized Debtor

The Reorganized Debtor will initially be managed by the below individuals. Pursuant to the US Trustee's Guidelines, also disclosed below is the respective annual compensation proposed to be paid to each individual and whether each individual is an "insider" as defined by 11 U.S.C. § 1129(a)(5).

- Chief Executive Officer: Alvaro Gazzolo, insider ($275,000)
- Chief Financial Officer: To be determined.

The below individuals are proposed as of the Effective Date to serve as directors and/or officers of the Reorganized Debtor. Additional directors may be added prior to the Effective Date.

- Alvaro Gazzolo
- Brian Rossing

### E.    Projected Financial Information

Attached hereto as <u>Exhibit C</u> are the financial projections prepared by the Debtor for the Reorganized Debtor's operations for the period described therein after

the Effective Date (the "Projections"). These Projections support, among other things, the Debtor's discussion of the feasibility of the Plan pursuant to § 1129(a)(11) of the Bankruptcy Code, discussed in Section VI.D.2 below.

## VI.   CONFIRMATION OF THE PLAN

### A.   Introduction

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed. It requires further that a disclosure statement concerning such plan be adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met. Thus, even if the requisite vote is achieved for the Voting Classes, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

### B.   Voting

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan. A holder of a Claim or Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in § 1124 of the Bankruptcy Code is considered Impaired. Pursuant to § 1126(f) of the Bankruptcy Code, holders of Claims that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote. Pursuant to § 1126(g) of the Bankruptcy Code, any holders of Claims or Interests that do not receive or retain any property under the Plan on account of such

Claims or Interests are conclusively deemed to have rejected the Plan and are not entitled to vote.

Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Voting Classes or (ii) are otherwise permitted by the Bankruptcy Code to vote.

## C.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote. The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote. Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan. Except in the context of a "cram down" pursuant to § 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accept the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Interests, the Debtor has the right, assuming that at least one Class of Impaired Claims or Interests has accepted the Plan, to request confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down." As such, if any Voting Class votes to reject the Plan, the Debtor will request confirmation of the Plan under § 1129(b) of the Bankruptcy Code.

## D.    Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests,

property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan, subject to Section VI.D.4, "Cram Down."

- Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expense claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, the Debtor believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain of the relevant statutory confirmation requirements.

1.    **Best Interests of Holders of Claims and Interests**

The "best interests" test requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims and equity interests will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Plan satisfies the best interests test as follows. The Debtor's assets are all encumbered by Liens in favor of its secured creditors, including NDJR, securing over $44 million in debt. The Marketing Process is intended to expose the Debtor to the market to determine whether any recoveries are available to (i) secured creditors with a Lien on the Debtor's assets junior to that of NDJR and (ii) unsecured creditors. It is only after the conclusion of the Marketing Process that the Debtor is proceeding with the Plan as a better alternative for creditors. If the Marketing Process does not result in any recoveries to secured creditors holding Liens junior to those of NDJR, much less to unsecured creditors, then they would be "out of the money." As such, it would be likely that in a chapter 7 liquidation, the holders of such Secured Claims, Secured Tax Claims, Priority Non-Tax Claims and General Unsecured Claims would receive nothing. However, under the Plan, NDJR is funding the Exit Facility that will be used, in part, to make the payments due on the Effective Date of the Plan, including outstanding Administrative Expense Claims, Priority Non-Tax Claims, and the full amount of the Pre-Petition First Lien Claim. In addition, a portion of the Pre-Petition Second Lien Claim equal to the Settled Pre-Petition Second Lien Debt Amount is being satisfied pursuant to the Debt-For-Equity Exchange described in the Plan. Lastly, holders of General Unsecured Claims (including those Claims that are deemed to be General Unsecured Claims) are receiving the right to future distributions from the Creditors Account.  As such, the reorganization under the Plan is in the best

414390-v2

interests of holders of Claims and Interests. For greater detail, see the liquidation analysis attached as Exhibit D hereto.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

For purposes of determining whether the Plan satisfies the feasibility requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtor has prepared the Projections attached hereto as Exhibit C. The Projections provide that the Reorganized Debtor should be able to meet all of its obligations under the Plan and is not likely to be liquidated after the Effective Date. Among other things, the Projections provide that the Reorganized Debtor, as supported by NDJR, should have the wherewithal to make the payments required under the Plan, including any payments due to holders of Allowed Priority Non-Tax Claims and Allowed Secured Tax Claims, as well as meet its obligations under the Exit Facility.

Under the Plan, other than for the Pre-Petition First Lien Claim in the approximate amount of $86,000, the Exit Facility and the Claims of NDJR on account of its DIP Facility and Non-Settled Pre-Petition Second Lien Debt Amount, the Debtor will bear no future-looking obligations and, with respect to the obligations under Pre-Petition First Lien Claim and the Exit Facility, the Debtor can feasibly satisfy such obligations. With respect to the obligations under the Non-Settled Pre-Petition Second Lien Debt Amount, those are favorable to the Reorganized Debtor as the maturity of such indebtedness is extended for 5 years and the interest under the Non-Settled Pre-Petition Second Lien Amount can be capitalized as PIK interest at the option of the Reorganized Debtor. Only Allowed Secured Tax Claims and Priority Non-Tax Claims will have future payments by the Reorganized Debtor that are pre-

Case No. 20-03779-LT11

DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION

determined as of the Effective Date, and the Exit Facility will be used, in part, to support the Debtor to make the payments on account of such Claims. The only other creditors receiving any distributions under the Plan are the holders of General Unsecured Claims (including those Claims that are deemed to be General Unsecured Claims). The holders of Allowed General Unsecured Claims will receive distributions only to the extent there are tax savings generated by the NOL carryforwards, capped at $500,000. Further, the Reorganized Debtor will be owned by NDJR, who has the financial wherewithal and ability to make further accommodations to the Reorganized Debtor with respect to the indebtedness owed to NDJR or even inject further funding into the Reorganized Debtor as may be needed to ensure its success.

While there is no guarantee that the Reorganized Debtor's actual performance will mirror the Projections, the Debtor believes, based on the Projections and the discussion herein, that the Reorganized Debtor should be able to meet its obligations under the Plan.

### 3.    Acceptance by Impaired Classes

A class is impaired under a plan unless, with respect to each claim of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances to such class is not required.

With respect to the Plan, holders of Claims in Classes 1 and 9 are Unimpaired and are deemed to have accepted the Plan. Holders of Claims or Interests in Classes 2 through 8 and Classes 10 and 11 are Impaired and entitled to vote on the Plan.

Holders of Interests in Class 12 shall receive nothing on account of such interest and are therefore deemed to reject the Plan.

### 4.    Cram Down

A plan is accepted by an impaired class of claims or interests if holders of at least two- thirds in dollar amount and a majority in number of claims or interests in that class vote to accept the plan. Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in § 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of § 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims and Interests that is impaired under, and has not accepted, the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or interests receives full compensation for its Allowed Claims or interests, no holder of Allowed Claims or interests in any junior class may receive or retain any property on account of such claims or interests. The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank.

The Debtor intends to seek "cram down" of the Plan on any Class rejecting the Plan. The Debtor submits that the Plan satisfies the absolute priority rule and does not unfairly discriminate against any Class that may not accept or consent to the Plan.

The Plan satisfies the absolute priority rule as it does not permit holders of Allowed Claims or interests in any junior class to receive or retain property on account

of such claims or interests until senior classes are compensated in full for their Allowed Claims.

As to the "discriminate unfairly" test, the Debtor submits the Plan does not unfairly discriminate against any Class that may not accept or otherwise consent to the Plan.

### 5. Classification of Claims

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code that require that a plan place each claim into a class with other claims that are "substantially similar."

## VII.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. Financing Risks

Although the Debtor projects that the Reorganized Debtor will have sufficient liquidity to operate its business through completion of all payments required to be made under a reorganization pursuant to the Plan, there is no assurance that the Reorganized Debtor will generate sufficient revenues in the upcoming months and years to cover all such payments along with all expenditures incurred in the Reorganized Debtor's business.

### B. Risk of Non-Confirmation or Withdrawal of the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 Case will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims as the terms of the Plan.

### C.    Non-Consensual Confirmation of the Plan

Pursuant to the "cram down" provisions of § 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes of Claims, so long as at least one Impaired Class of Claims has accepted the Plan. For a description of the "cram down" provisions of the Bankruptcy Code, see Section VI.D.4, "Cram Down."

### D.    Alternatives to the Plan

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under §§ 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code. After careful review of the estimated recoveries in a chapter 7 liquidation scenario and as set more in more detail in Section VI.D.1 above, the Debtor has concluded that recoveries to holders of Claims under the Plan will be higher than the recoveries in a chapter 7 case. Should the Plan not be confirmed, it is likely that distributions, if any, to holders of Claims would be eliminated or reduced by the additional fees and other costs associated with a chapter 7 liquidation.

If the Plan is not confirmed, the Debtor, or any other party-in-interest, may attempt to formulate an alternative chapter 11 plan, which might provide for a reorganization or for the liquidation of the Debtor's assets other than as provided under the Plan. Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay distributions to holders of Claims and may not result in the financing and concessions by certain of the Debtor's creditors that made possible the formulation of the Plan and the distributions to creditors thereunder. In addition, due to the incurrence of additional Administrative Expense Claims during the period of

any delay in formulating an alternative Plan, distributions to holders of Claims could be adversely impacted.

Accordingly, the Debtor believes that the Plan offers the best prospect of recovery for the holders of Claims against the Debtor.

## VIII.  SECURITIES LAW MATTERS

### A.    General

The Plan provides for the Reorganized Debtor to issue New Common Stock. The Debtor believes that this new stock constitutes "securities," as defined in Section 2(a)(1) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a et seq. (the "**Securities Act**"), § 101(49) of the Bankruptcy Code and applicable state securities laws.

### B.    Issuance of New Stock

The Debtor believes that the offer and sale of the New Common Stock pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code. Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security generally do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the Debtor, and (c) the securities are issued in exchange for such claim against, interest in, or claim for administrative expense against, the Debtor or are issued principally in such exchange and partly for cash and property. In reliance upon § 1145 of the Bankruptcy Code, the New Common Stock will not be registered under the Securities Act or any state securities laws.

### C.    Resale of New Common Stock

Any subsequent transfers of the New Common Stock by the holder or holders thereof will need to be exempt from federal and state securities registration

requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws. The Debtor recommends that the recipient of the New Common Stock consult with his/her/its own legal advisors as to the availability of any such exemption from registration under the Securities Act, the Bankruptcy Code and applicable state securities laws in any given instance and as to any applicable requirements or conditions to such availability.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The Federal income tax consequences of the Plan are complex. All Holders of Claims against and Interests in the Debtor should consult with their tax advisors as to the particular tax consequences to them of the plan and the ownership and disposition of Claims including the applicability and effect of any state, local or foreign (non-us) tax laws and of any change in applicable tax laws.

### A.    United States Federal Income Tax Consequences to Debtor

#### 1.    Cancellation of Indebtedness Income

Under Section 61 of Title 26 of the U.S. Code (the "**IRC**"), a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD income**") realized during the taxable year. IRC section 108(a)(1)(A) provides an exception to this general rule if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

IRC section 108(b) requires that any amount of COD income so excluded from gross income to be applied to reduce the following tax attributes of the taxpayer in the following order: (a) any net operating loss ("**NOL**") for the taxable year of the discharge and any NOL carryforwards to such year; (b) any general business credit carryforwards; (c) any minimum tax credit carryforwards; (d) any capital loss carryforwards; (e) the tax basis of the taxpayer's depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f)

any passive activity loss and credit carryforwards; and (g) any foreign tax credit carryforwards. However, a taxpayer can elect under IRC section 108(b)(5) to apply the tax attribute reduction first to reduce the tax basis of its depreciable property (without regard to the amount of its liabilities) and then to reduce its NOLs and other tax attributes. A reduction in tax attributes under the foregoing rules does not occur until the end of the taxable year or, in the case of an asset basis reduction, the first day of the taxable year following the taxable year, in which the COD income is realized. Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Holders of Claims may receive less than full payment on their Claims. The Debtor's liability to the holders of Claims in excess of the amount satisfied by distributions under the Plan will be discharged. As a result of the discharge of Claims pursuant to the Plan, the Debtor is expected to realize COD. Any COD income that the Debtor realizes as a result of such discharge should be excluded from the Debtor's gross income pursuant to the bankruptcy exception under IRC section 108(a)(1)(A) described in the immediately preceding paragraph. The exclusion of COD income under this exception will result in a reduction of certain tax attributes of the Debtor. The Debtor has not determined whether it will make the election under IRC section 108(b)(5) to apply the COD income to first reduce the basis of depreciable property before reducing other available tax attributes.

## 2. General Section 382 Annual Limitation

In general, IRC section 382 imposes an annual limitation on the ability of a corporation that undergoes an "ownership change" to deduct pre-change NOLs equal to the product of (i) the fair market value of the corporation's stock immediately before the "ownership change" (with certain adjustments) and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in

which the "ownership change" occurs, which is 0.89 percent for September 2020). The section 382 limitation may be increased to the extent the corporation recognizes certain built-in gain in its assets during the five-year period following the "ownership change" or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, as modified by IRS Notice 2018-30, but only to the extent the corporation has net unrealized built-in gain at the time of the "ownership change". IRC section 383 applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent tax year.

Special rules may apply to prevent the imposition of an annual NOL limitation in the case of a corporation that experiences an "ownership change" as the result of a bankruptcy proceeding.  Notwithstanding these special rules, though, if following such an "ownership change" a corporation does not continue its historic business, or use a significant portion of its historic business assets in a new business, for two years following the "ownership change", a second "ownership change" that occurs within that two year period will cause the corporation's section 382 limitation to be zero.

## B.    United States Federal Income Tax Consequences to Holders of Claims

### 1.    Distributions in Discharge of Accrued Interest

In general, to the extent that money or property received by a holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such a holder will recognize a deductible loss to the extent any accrued interest or original issue discount ("**OID**") that was previously included in such holder's gross income is not paid in full.

Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

## 2. Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, whether the Claim constitutes a capital asset in the hands of the holder, the holder's holding period for the Claim, whether the Claim was acquired at a market discount, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. A holder of a Claim that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## 3. Limitation on Use of Capital Losses

Holders of Claims that recognize capital losses as a result of payment of their Claims under the Plan will be subject to limits on their use of capital losses. For noncorporate Claim holders, capital losses may be used each year to first offset any capital gains (without regard to holding periods), and any remaining capital loss can be used to offset up to $3,000 of ordinary income ($1,500 for married individuals filing separate returns). For corporate Claim holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders of Claims who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Noncorporate holders of Claims may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income (see described immediately above) for an unlimited number of years. Corporate Claim holders may only carry over unused capital losses for the five

years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 4.    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 24%) under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

# X.   CONCLUSION

The Debtor urges holders of Claims in the Voting Classes to vote to accept the Plan and to evidence such acceptance by returning their completed and signed Ballots so they will be received by the Debtor in accordance with the Voting Instructions by the Voting Deadline

Dated:  October 30, 2020          SULLIVAN HILL REZ & ENGEL
                                  A Professional Law Corporation

                                  By:   */s/ Christopher V. Hawkins*
                                        Christopher V. Hawkins
                                        Attorneys for Debtor and Debtor in Possession
                                        INGENU, INC.

1

## **EXHIBIT TABLE**

| Exhibit No. | Description | Pages |
|---|---|---|
| A | Chapter 11 Plan of Reorganization | 69 - 122 |
| B | Schedule of Claims by Classes | 123 - 130 |
| C | Feasibility Projections | 131 - 133 |
| D | Liquidation Analysis | 134 - 141 |

**Exhibit A**

1
2
3
4  SULLIVAN HILL REZ & ENGEL
   A Professional Law Corporation
5   James P. Hill, CA Bar No. 90478
    Christopher V. Hawkins, CA Bar No. 222961
6   Kathleen Cashman-Kramer, CA Bar No. 128861
   600 B Street, Suite 1700
7  San Diego, CA 92101
   Telephone:   (619) 233-4100
8  Facsimile:    (619) 231-4372
   hill@sullivanhill.com
9  hawkins@sullivanhill.com
10 Counsel for Debtor and Debtor in Possession,
   Ingenu, Inc.
11
12              UNITED STATES BANKRUPTCY COURT
13              SOUTHERN DISTRICT OF CALIFORNIA
14
15 In re                              CASE NO. 20-03779-LT11
16 INGENU, INC.                       Chapter 11
17         Debtor.
                                      **REVISED CHAPTER 11 PLAN OF
18                                    REORGANIZATION FOR THE DEBTOR**

19                                    Date:      December 15, 2020
                                      Time:      9:00 a.m.
20                                    Ctrm:      Dept. 3, Room 129
                                                 United States Bankruptcy Court
21                                               325 West F Street
                                                 San Diego, CA 92101-6991
22                                    Judge:   Hon. Laura S. Taylor
23
24
25
26
27
28

414395-v2                          -1-

# **TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................................................................................................... 5

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ............................................ 20

2.1   Allowed Administrative Expense Claims ................................................ 20
2.2   Requests for Allowance of Administrative Expense Claims ................... 20
2.3   Allowed Priority Tax Claims ................................................................... 21
2.4   Other Provisions Concerning Treatment of Priority Tax Claims ........... 21
2.5   DIP Loan Claim ....................................................................................... 22
2.6   Payment of Statutory Fees ...................................................................... 22

ARTICLE III CLASSES OF CLAIMS AND INTERESTS ............................................ 22

3.1   Class 1 (Priority Non-Tax Claims) ......................................................... 22
3.2   Class 2 (Pre-Petition First Lien Claim) .................................................. 22
3.3   Class 3 (Pre-Petition Second Lien Claim) .............................................. 22
3.4   Class 4 (Grid Secured Claim) .................................................................. 22
3.5   Class 5 (LFT Secured Claim) .................................................................. 23
3.6   Class 6 (JBJK Secured Claim) ................................................................ 23
3.7   Class 7 (Gilbert Trust Secured Claim) .................................................... 23
3.8   Class 8 (Trilliant Secured Claim) ............................................................ 23
3.9   Class 9 (Secured Tax Claims) .................................................................. 23
3.10  Class 10 (Other Secured Claims) ............................................................ 23
3.11  Class 11 (General Unsecured Claims) ..................................................... 23
3.12  Class 12 (Interests) .................................................................................. 23

ARTICLE IV IDENTIFICATION OF IMPAIRED CLASSES AND VOTING CLASSES .................................................................................................... 23

4.1   Impaired Classes of Claims Entitled to Vote .......................................... 23
4.2   Class Deemed to Accept the Plan ............................................................ 23
4.3   Class Deemed to Reject the Plan ............................................................. 23
4.4   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ...... 24

ARTICLE V TREATMENT OF CLASSES OF CLAIMS AND INTERESTS ................. 24

5.1   Treatment of Class 1 – Priority Non-Tax Claims ................................... 24
5.2   Treatment of Class 2 – Pre-Petition First Lien Claim ............................ 25
5.3   Treatment of Class 3 – Pre-Petition Second Lien Claim ........................ 25
5.4   Treatment of Class 4 – Grid Secured Claim ........................................... 26
5.5   Treatment of Class 5 – LFT Secured Claim ............................................ 26
5.6   Treatment of Class 6 – JBJK Secured Claim .......................................... 27

-2-

5.7    Treatment of Class 7 – Gilbert Trust Secured Claim ............................................. 27

5.8    Treatment of Class 8 – Trilliant Secured Claim ................................................... 27

5.9    Treatment of Class 9 – Secured Tax Claims ......................................................... 27

5.10   Treatment of Class 10 – Other Secured Claims .................................................... 28

5.11   Treatment of Class 11 – General Unsecured Claims ............................................ 28

5.12   Treatment of Class 12 – Interests .......................................................................... 28

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ............................... 28

6.1    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor ............................................................................................................................. 28

6.2    Corporate Action ................................................................................................... 29

6.3    Certificate of Incorporation and Bylaws .............................................................. 29

6.4    Release of Liens .................................................................................................... 29

6.5    Cancellation of Interests and Authorization and Issuance of New Stock. ............. 30

6.6    The Exit Facility .................................................................................................... 30

6.7    Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor. ................................................................................................................... 32

6.8    Disbursing Agent .................................................................................................. 33

6.9    Closing of Case ..................................................................................................... 33

6.10   Effectuating Documents; Further Transactions .................................................... 33

6.11   Withholding and Reporting Requirements ............................................................ 34

6.12   Quarterly Reports and United States Trustee's Fees ............................................ 34

6.13   Preservation of Causes of Action. ........................................................................ 34

6.14   No Liability for Solicitation or Participation. ...................................................... 35

6.15   Exemption from Certain Taxes. ............................................................................ 36

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ................................... 37

7.1    Distributions .......................................................................................................... 37

7.2    Distributions of Cash ............................................................................................ 37

7.3    Effective Date Payments ....................................................................................... 37

7.4    Delivery of Distributions and Undeliverable Distributions ................................. 37

7.5    Time Bar to Cash Payments and Disallowances ................................................... 38

7.6    Minimum Distributions ......................................................................................... 38

7.7    Transactions on Business Days ............................................................................. 38

7.8    Distributions after Allowance ............................................................................... 39

7.9    Disputed Payments ................................................................................................ 39

7.10   No Distributions in Excess of Allowed Amount of Claim .................................... 39

ARTICLE VIII PROCEDURES REGARDING DISPUTED CLAIMS ........................... 39

8.1    Objections to Claims. ............................................................................................ 39

-3-

8.2   No Distributions Pending Determination of Allowance of Disputed Claims........ 40

8.3   Reserve Accounts for Disputed Claims ............................................................... 40

8.4   Investment of Disputed Claims Reserve ............................................................. 40

8.5   Allowance and Payment of Disputed Claims ...................................................... 41

8.6   Release of Excess Funds from Disputed Claims Reserve ................................... 41

8.7   Estimation ........................................................................................................... 41

ARTICLE IX TREATMENT OF EXECUTORY CONTRACTS
        AND UNEXPIRED LEASES......................................................................... 42

9.1   Rejection of Executory Contracts and Unexpired Leases.................................... 42

9.2   Bar Date for Filing Rejection Claims ................................................................. 43

ARTICLE X CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ...... 43

10.1   Conditions to the Effective Date........................................................................ 43

10.2   Waiver of Conditions ........................................................................................ 44

ARTICLE XI EFFECT OF CONFIRMATION ...................................................................... 44

11.1   DISCHARGE OF THE DEBTOR ..................................................................... 44

11.2   INJUNCTION .................................................................................................... 45

11.3   No Waiver of Discharge .................................................................................... 46

11.4   Binding Effect ................................................................................................... 46

11.5   Term of Injunctions or Stays............................................................................. 46

11.6   Setoffs ............................................................................................................... 46

ARTICLE XII RETENTION OF JURISDICTION ............................................................... 47

ARTICLE XIII MISCELLANEOUS PROVISIONS ............................................................. 49

13.1   Modification of Plan .......................................................................................... 49

13.2   Extensions of Time ............................................................................................ 49

13.3   Releases and Related Matters. .......................................................................... 49

13.4   Dissolution of the Committee ........................................................................... 51

13.5   Default................................................................................................................ 51

13.6   Notices................................................................................................................ 52

13.7   Choice of Law .................................................................................................... 53

13.8   Captions.............................................................................................................. 53

-4-

## INTRODUCTION

Ingenu, Inc., a Delaware corporation (the "**Debtor**" or "**Ingenu**") proposes the following plan of reorganization (the "**Plan**") for the resolution of the outstanding claims against and equity interests in Ingenu. Ingenu is the proponent of the Plan within the meaning of § 1129 of the Bankruptcy Code (11 U.S.C. § 101 et seq.). Reference is made to Ingenu's disclosure statement, to be filed with the Plan (the "**Disclosure Statement**"), for a discussion of Ingenu's history, business, results of operations, and for a summary and analysis of the Plan. There also are other agreements and documents (the "**Plan Supplement**"), which will be filed with the Bankruptcy Court, that are referenced in the Plan or the Disclosure Statement and that will be available for review.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION

## AND COMPUTATION OF TIME

**A.**    <u>Scope of Definitions</u>

Unless otherwise stated, all terms not defined herein shall have the meaning set forth in the Bankruptcy Code and the Bankruptcy Rules. Where there is a conflict between the defined terms herein and any terms in the Bankruptcy Code or the Bankruptcy Rules, the definitions herein shall control. The following terms when used in the Plan shall have the meanings set forth in this Article.

**B.**    <u>Definitions</u>

**1.1**    "**Administrative Expense Claim**" means a Claim for costs and expenses of administration allowed under §§ 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries and payments for inventories, leased equipment and premises); (b) Professional Fee Claims; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

**1.2**    "**Allowed**" means, with reference to a Claim:

    **a.**    A Claim that (i) has been listed by the Debtor in its Schedules as other than disputed, contingent or unliquidated; and (ii) is not otherwise a Disputed Claim;

    **b.**    A Claim (i) for which a Proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date or otherwise been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or

    **c.**    A Claim that is allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the Reorganized Debtor and the Claimant on or after the Effective Date; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) pursuant to a Final Order; or (iv) pursuant to the terms of the Plan.

**1.3** "**Amended Certificate of Incorporation and Bylaws**" means the amended and restated certificate of incorporation and amended and restated bylaws of the Reorganized Debtor, in substantially the form to be included in the Plan Supplement.

**1.4** "**Asset Sale**" means the sale of all or substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code that generates sufficient proceeds to pay in full the DIP Facility Claims, the Pre-Petition First Lien Claim and the Pre-Petition Second Lien Claim.

**1.5** "**Avoidance Actions**" means Causes of Action held by the Debtor and/or the Estate under §§ 544, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

**1.6** "**Ballot**" means the form or forms distributed to each holder of an Impaired Claim or Interest entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

**1.7** "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect at the relevant time.

**1.8** "**Bankruptcy Court**" means the United States Bankruptcy Court, Southern District of California, or any such Court having jurisdiction over the Chapter 11 Case.

-6-

**1.9** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as may be amended and as supplemented by any local bankruptcy rules adopted by the Bankruptcy Court.

**1.10** "**Bar Date**" means the applicable bar date by which a Proof of Claim must be or must have been filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

**1.11** "**Bar Date Order**" means an order of the Bankruptcy Court establishing Bar Dates for Filing Proofs of Claims in the Chapter 11 Case, as the same may be amended, modified or supplemented, and includes the Notice of Chapter 11 Bankruptcy Case issued and served by the Bankruptcy Court on July 29, 2020 as ECF No. 11, pursuant to which the Bar Date for filing a Proof of Claim for a Claim that arose before the Petition Date for non-governmental units is October 5, 2020 and the Bar Date applicable to governmental units is January 25, 2021.

**1.12** "**Board of Directors**" means that body vested with and having the powers and duties of governing the Reorganized Debtor.

**1.13** "**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.14** "**Cash**" means legal tender of the United States of America and equivalents thereof.

**1.15** "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims held by the Debtor or the Estate, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise.

**1.16** "**Chapter 11 Case**" means the above-captioned case commenced under Chapter 11 of the Bankruptcy Code by the Debtor.

**1.17** "**Claim**" means a "claim," as defined in § 101(5) of the Bankruptcy Code, against the Debtor.

**1.18** "**Claimant**" means the holder of a Claim.

**1.19** "**Class**" means a class of Claims or Interests as that term is used in § 1122 of the Bankruptcy Code.

**1.20** "**Committee**" means any statutory official committee of unsecured creditors in the Chapter 11 Case appointed pursuant to § 1102 of the Bankruptcy Code, as such Committee may be reconstituted from time to time.

**1.21** "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.22** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court, held under § 1128 of the Bankruptcy Code, to consider confirmation of this Plan and related matters, as such hearing may be adjourned or continued from time to time.

**1.23** "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

**1.24** "**Creditors Account**" means a segregated account established by the Reorganized Debtor for the benefit of the holders of Allowed General Unsecured Claims, which account will be funded from the potential Tax Benefit (defined below) in annual payments during the Measuring Period (defined below) as follows:

    **a.**    The aggregate amount funded by the Reorganized Debtor into the Creditors Account shall not exceed the lesser of (i) $500,000 or (ii) twenty percent (20%) of the aggregate actual Tax Benefit for the Measuring Period; provided, however, the amount of any annual payment shall not exceed $100,000 for any year during the Measuring Period. For purposes of the Plan, the "**Tax Benefit**" means any reduction in any liability for income taxes of the Reorganized Debtor and any subsidiaries for a taxable period beginning after December 31, 2020 as a result of any net operating loss carry forward arising in a taxable period ending on or before December 31, 2020 as reduced by any taxable income recognized

-8-

by the Reorganized Debtor or any subsidiaries to the extent attributable to the Plan (the "**NOL**"). The Tax Benefit will be computed annually by comparing (i) the actual federal, state and local income tax liability of the Reorganized Debtor for any taxable year during the Measuring Period in which it is able to utilize any such NOL to reduce its taxable income, to (ii) the amount of such income taxes that the Reorganized Debtor would have been required to pay with respect to such taxable year in the absence of such NOL. For purposes of the preceding sentence, any gross income recognized by the Reorganized Debtor as a result of any debt discharged in connection with this Plan shall not be taken into account in determining the Reorganized Debtor's taxable income for the relevant taxable year and, for the avoidance of doubt, any NOL utilized in the relevant taxable year shall be deemed to be the last deduction taken into account in such taxable year.

b.    The foregoing annual payments will be funded into the Creditors Account within one hundred and twenty (120) days following the end of each taxable period beginning after December 31, 2020 and will continue until the earlier of: (i) the expiration of the applicable carryforward period of the NOL with respect to any such taxable period; (ii) December 31, 2025; or (iii) the date the aggregate payments funded into the Creditors Account is $500,000 (the "**Measuring Period**").

c.    The Reorganized Debtor's ability to make these annual payments depends upon a number of factors, including (i) the Reorganized Debtor's ability to generate taxable income in the future; (ii) the amount of any taxable income that the Reorganized Debtor generates and timing thereof; (iii) the amount of net operating losses that the Reorganized Debtor is permitted under applicable law and regulations to use in a given year to generate tax savings; (iv) changes in U.S. state or federal tax law or IRS regulations; (v) the occurrence of a change of control or other event that limits or eliminates the amount of NOLs available to the Reorganized Debtor; and (vi) the outcome of an audit by the IRS or state taxing authority challenging the Reorganized Debtor's tax position with respect to the NOLs.

     **d.**     Because the Reorganized Debtor may later operate through one or more operating subsidiaries, the Reorganized Debtor's ability to make payments under the Plan is dependent on the ability of the Reorganized Debtor's subsidiaries to make distributions to the Reorganized Debtor.

     **e.**     In the event that the holder of a Claim in Class 11 transfers such claim, the Reorganized Debtor (i) may issue and deliver any distribution under the Plan to the original holder at its address of record on the Record Date, and (ii) shall have no obligations with respect to the transferee.

     **1.25**    "**Debt-For-Equity Exchange**" means the receipt by NDJR, pursuant to the terms of this Plan, of the New Common Stock in the Reorganized Debtor in satisfaction of the portion of the Pre-Petition Second Lien Claim that equals the difference (only if a positive value) between (i) the sum of (x) the amount of the Pre-Petition First Lien Claim, (y) the amount of the Pre-Petition Second Lien Claim, and (z) the amount of the DIP Facility Claims minus (ii) the cash consideration disclosed in the highest and best offer received by the Debtor in its Marketing Process described in the Disclosure Statement (such difference, the "**Settled Pre-Petition Second Lien Debt Amount**"). For the purpose of the foregoing calculation, the amount of the Pre-Petition Second Lien Claim satisfied pursuant as the Settled Pre-Petition Second Lien Amount shall be calculated based on the indebtedness owing and incurred under the Pre-Petition Second Lien Claim in a chronological order as it was incurred or arose beginning with the date of creation of the such indebtedness (*i.e.*, starting with the principal amounts extended in years 2014 and 2015 remaining outstanding, plus interest accruals, fees and related expenses in the order incurred on such amounts) prior to taking into account any portion of such indebtedness to the extent deemed related to a later period. For the avoidance of doubt, to the extent the Marketing Process does not lead to any offers or is terminated prior to the Debtor's receiving any offers, (i) the full amount of the Pre-Petition Second Lien Claim will be satisfied through issuance of the New Common Stock pursuant to the Debt-For-Equity Exchange; (ii) the amount of the Settled Pre-Petition Second Lien Debt Amount shall equal the amount of the Allowed Pre-Petition

-10-

Second Lien Claim; and (iii) the amount of the Non-Settled Pre-Petition Second Lien Debt Amount shall equal zero Dollars ($0).

**1.26** "**Debtor**" means Ingenu as a debtor under Chapter 11 of the Bankruptcy Code.

**1.27** "**DIP Credit Agreement**" means the Senior Secured and Priming Superpriority Debtor-in-Possession Credit Agreement dated as of the Petition Date, by and between the Debtor and the DIP Lender, as such may be amended from time to time.

**1.28** "**DIP Facility**" or "**DIP Loan**" means the post-petition financing provided under the DIP Credit Agreement.

**1.29** "**DIP Lender**" means the NDJR in its capacity as the lender under the DIP Loan.

**1.30** "**DIP Loan Obligation**" means the principal amount of indebtedness outstanding under the DIP Credit Agreement, accrued interest thereon and any and all unpaid expenses of the DIP Lender including without limitation, outstanding DIP Lender's attorneys' fees and expenses.

**1.31** "**DIP Order**" means the Interim, Final and/or any subsequent orders approving the DIP Loan.

**1.32** "**DIP Facility Claims**" means all Claims arising under or relating to the DIP Facility, whether pursuant to the DIP Credit Agreement, any other DIP Loan Document, any notes, the DIP Order, or otherwise.

**1.33** "**Disallowed Claim**" means a Claim or any portion thereof, that (a) has been disallowed by a Final Order, (b) is scheduled at zero or as contingent, disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, or (c) is not listed on the Schedules and as to which a Bar Date has been set but no Proof of Claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

**1.34** "**Disbursing Agent**" means the Reorganized Debtor, or any Person designated by the Reorganized Debtor to serve as disbursing agent under this Plan.

**1.35** "**Disclosure Statement**" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the Debtor, as the same may be amended, modified or supplemented.

**1.36** "**Disputed Claim**" means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim and includes, without limitation, Claims that (a) (i) have not been listed on the Schedules by the Debtor or have been scheduled at zero or as unknown, contingent, unliquidated or disputed, and (ii) are not the subject of an objection filed in the Bankruptcy Court but as to which the time for filing an objection has not yet expired, (b) that are the subject of a Proof of Claim that differs in nature, amount or priority from the Schedules, or (c) are the subject of an objection filed with the Bankruptcy Court, which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.37** "**Effective Date**" means the Business Day on which all conditions set forth in Article X of this Plan have been either satisfied or waived as provided in Section 10.2 of this Plan.

**1.38** "**Estate**" means the estate created for the Debtor in the Chapter 11 Case pursuant to § 541 of the Bankruptcy Code.

**1.39** "**Executory Contract**" or "**Unexpired Lease**" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under § 365 of the Bankruptcy Code, whether or not listed in the Debtor's Schedules.

**1.40** "**Exit Facility**" means a credit facility provided by the Exit Facility Lender to the Reorganized Debtor pursuant to the Exit Financing Agreement. "Exit Facility Amount" means an amount up to one million and No/100 Dollars ($1,000,000).

**1.41** "**Exit Facility Amount**" means an amount up to one million and No/100 Dollars ($1,000,000).

**1.42** "**Exit Facility Lender**" means NDJR in its capacity as the lender under the Exit Financing Agreement.

-12-

**1.43**   "**Exit Financing Agreement**" means the credit agreement to be entered into as of the Effective Date by and between the Reorganized Debtor and the Exit Facility Lender. The Exit Financing Agreement shall be on the terms and conditions substantially similar to those of the DIP Credit Agreement and otherwise consistent with the terms set forth in Section 6.6 of the Plan.

**1.44**   "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely filed, or as to which any appeal that has been filed or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

**1.45**   "**General Unsecured Claim**" means any Unsecured Claim against the Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not an Administrative Expense Claim, DIP Facility Claim, Priority Tax Claim, Priority Non-Tax Claim, or Other Secured Claim, but which includes any claim arising from the rejection of an Executory Contract, and is unpaid as of the Effective Date.

**1.46**   "**Gilbert Trust**" means John S. Gilbert and Barbara J. Gilbert, trustees of the Gilbert Family Trust, dated March 1, 1993.

-13-

**1.47** "**Gilbert Trust Secured Claim**" means the Claim of the Gilbert Trust against the Debtor under or pursuant to the Gilbert Trust Subordinated Secured Note.

**1.48** "**Gilbert Trust Subordinated Secured Note**" means the issued Subordinated Secured Convertible Promissory Note issued by Ingenu to the Gilbert Trust prior to the Petition Date.

**1.49** "**Grid**" means Grid Partners IIIA, L.P.

**1.50** "**Grid Secured Claim**" means the Claim of Grid against the Debtor under or pursuant to the Grid Subordinated Secured Notes.

**1.51** "**Grid Subordinated Secured Notes**" means the issued Subordinated Secured Convertible Promissory Notes issued by Ingenu to Grid prior to the Petition Date.

**1.52** "**Impaired**" means when used with reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of § 1124 of the Bankruptcy Code.

**1.53** "**Interest**" or "**Interests**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

**1.54** "**JBJK**" means JBJK Investments, LP.

**1.55** "**JBJK Secured Claim**" means the Claim of JBJK against the Debtor under or pursuant to the JBJK Subordinated Secured Notes.

**1.56** "**JBJK Subordinated Secured Notes**" means the issued Subordinated Secured Convertible Promissory Notes issued by Ingenu to JBJK prior to the Petition Date.

**1.57** "**LFT**" means LFT Capital, LLC.

**1.58** "**LFT Secured Claim**" means the Claim of LFT against the Debtor under or pursuant to the LFT Subordinated Secured Notes.

-14-

**Exhibit A
Page 83**

1      **1.59**    "**LFT Subordinated Secured Notes**" means the issued Subordinated Secured
2   Convertible Promissory Notes issued by Ingenu to LFT prior to the Petition Date.

3      **1.60**    "**Lien**" or "**Liens**" means a lien, security interest or charge against or interest
4   in property of the Debtor to secure payment of a debt or performance of an obligation owed
5   by the Debtor.

6      **1.61**    "**NDJR**" means NDJR Grid Partners II, LLC.

7      **1.62**    "**New Common Stock**" means the shares of common stock of the Reorganized
8   Debtor to be issued on the Effective Date in accordance with <u>Section 6.5</u> of this Plan.

9      **1.63**    "**Non-Settled Pre-Petition Second Lien Debt Amount**" means the portion
10   of the Pre-Petition Second Lien Claim that remains unsatisfied after giving effect to the
11   Debt-For-Equity Exchange pursuant to which the Settled Pre-Petition Second Lien Debt
12   Amount is satisfied by the issuance of New Common Stock.

13      **1.64**    "**Officers**" means those persons chosen by the Board of Directors as the
14   officers who shall perform the executive duties of the Reorganized Debtor.

15      **1.65**    "**Organizational Documents**" means the bylaws, articles of incorporation,
16   corporate charters, certificates of formation, limited liability agreements or other documents
17   or agreements that govern or affect the corporate formation and governance of the Debtor
18   and the Reorganized Debtor.

19      **1.66**    "**Ordinary Course Administrative Expense Claims**" means Administrative
20   Expense Claims incurred in the ordinary course of the Debtor's business.

21      **1.67**    "**Other Secured Claim**" means any Secured Claim other than a DIP Facility
22   Claim, Pre-Petition First Lien Claim, Pre-Petition Second Lien Claim, Gilbert Trust Claim,
23   Grid Secured Claim, LFT Secured Claim, JBJK Secured Claim, or Trilliant Secured Claim.

24      **1.68**    "**Person**" means an individual, corporation, partnership, joint venture,
25   association, joint stock company, limited liability company, limited liability partnership,
26   trust, estate, unincorporated organization, governmental unit (as defined in § 101(27) of the
27   Bankruptcy Code), or other entity.

28

**Exhibit A**
**Page 84**

**1.69** "**Petition**" means the voluntary petition for relief filed by the Debtor with the Bankruptcy Court on July 27, 2020 under Chapter 11 of the Bankruptcy Code, and any amendments or modifications thereto.

**1.70** "**Petition Date**" means the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

**1.71** "**Plan**" means this Chapter 11 plan of reorganization for the Debtor, either in its present form or as it may be altered, amended, or modified, including all Exhibits thereto.

**1.72** "**Plan Supplement**" means the supplement to this Plan filed by the Debtor the Bankruptcy Court on or before the Confirmation Date.

**1.73** "**Pre-Petition First Lien Claim**" means the Claim of the Pre-Petition First Lien Lender under its Pre-Petition Senior Loan Documents.

**1.74** "**Pre-Petition First Lien Lender**" means Lakefront Associates, LLC in its capacity as the lender under the Pre-Petition Loan Agreement.

**1.75** "**Pre-Petition First Lien Loan Agreement**" means the Loan and Security Agreement dated September 21, 2011 by and between Ingenu, as borrower, and Lakefront Associates, LLC, as the successor to the original lender thereunder.

**1.76** "**Pre-Petition Second Lien Claim**" means the Claim of the Pre-Petition Second Lien Lender under its Pre-Petition Senior Loan Documents.

**1.77** "**Pre-Petition Second Lien Lender**" means NDJR in its capacity as the lender under the Pre-Petition Second Lien Secured Note.

**1.78** "**Pre-Petition Second Lien Secured Note**" means the Secured Senior Subordinated Convertible Promissory Note as amended as of June 27, 2017 issued by Ingenu to NDJR.

**1.79** "**Pre-Petition Senior Loan Documents**" means the Pre-Petition First Lien Loan Agreement and the Pre-Petition Second Lien Secured Note and the documents and agreements executed or delivered in connection therewith, respectively.

1.80    "**Pre-Petition Senior Lenders**" means, collectively, the Pre-Petition First Lien Lender and Pre-Petition Second Lien Lender, each in its capacity as the lender under its respective Pre-Petition Senior Loan Documents.

1.81    "**Priority Non-Tax Claim**" means a Claim that is entitled to priority in payment pursuant to § 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim, a DIP Facility Claim or a Priority Tax Claim.

1.82    "**Priority Tax Claim**" means a Claim that is entitled to priority in payment pursuant to § 507(a)(8) of the Bankruptcy Code.

1.83    "**Professional**" means any professional employed in the Chapter 11 Case pursuant to §§ 327, 328, or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to § 503(b)(4) of the Bankruptcy Code.

1.84    "**Professional Fee Claim**" means a Claim under §§ 328, 330(a), 331, 333, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Case.

1.85    "**Proof of Claim**" means Official Form 10 as is used in the Bankruptcy Court or similar filing as evidence of a Claim, properly filled-out, executed with supporting documentation, and filed with the Bankruptcy Court before any applicable Bar Date.

1.86    "**Property**" means all assets or property of the Estate of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts and Causes of Action (whether direct or derivative), previously or now owned by Ingenu or the Reorganized Debtor, as the case may be, or acquired by the Estate, as defined in § 541 of the Bankruptcy Code.

1.87    "**Pro Rata**" means when used with reference to a distribution to holders of Allowed Claims in a particular Class or other specified group of Claims pursuant to Article V of the Plan, proportionately so that with respect to a particular Allowed Claim in such Class, the ratio of (a)(i) the amount of Cash distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of

-17-

Cash distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.

**1.88** "**Record Date**" shall mean means the date for determining which holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Effective Date.

**1.89** "**Rejection Claim**" shall have the meaning ascribed thereto in Section 9.1 of the Plan.

**1.90** "**Reorganized Debtor**" means Ingenu on and after the Effective Date.

**1.91** "**Schedules**" means the schedules of the Debtor's assets and liabilities and the statement of financial affairs filed by the Debtor, as required by § 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

**1.92** "**Secured**" or "**Secured Claim**" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.93** "**Secured Tax Claim**" means a Claim that would otherwise meet the description of an unsecured Claim of a governmental unit under § 507(a)(8) of the Bankruptcy Code but is secured by a Lien on property in which the Estate has an interest, to the extent of the value of the Claimant's interest in the Estate's interest in such property.

**1.94** "**Settled Pre-Petition Second Lien Debt Amount**" has the meaning assigned thereto in the definition of "Debt-For-Equity Exchange".

**1.95** "**Stipulation of Amount and Nature of Claim**" means a stipulation or other agreement between the Debtor or the Reorganized Debtor and a Claimant, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim.

**1.96** "**Trilliant**" means Trilliant Networks (Canada) Inc.

**1.97** "**Trilliant Contract**" mean the Value Added Reseller Agreement dated October 28, 2015, by and between the Debtor and Trilliant, as amended on November 23, 2017 and on March 1, 2018.

-18-

**1.98** "**Trilliant Secured Claim**" means the Claim of Trilliant against the Debtor under or pursuant to the Trilliant Subordinated Secured Notes.

**1.99** "**Trilliant Subordinated Secured Notes**" means the issued Subordinated Secured Convertible Promissory Notes issued by Ingenu to Trilliant prior to the Petition Date.

**1.100** "**Unclassified Claims**" means those Claims described in Article II of this Plan.

**1.101** "**Unimpaired**" means, when used with reference to a Claim, a Claim that is not Impaired.

**1.102** "**United States Trustee**" means the United States Trustee for the Southern District of California.

**1.103** "**Unsecured Claim**" means any Claim that is not a Secured Claim.

## C.    Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to a Person as a holder of a Claim includes that Person's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, articles of incorporation, bylaws, similar constituent documents, instrument, release or other

-19-

agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in § 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section 1(C).

**D.      Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**ARTICLE II**

**TREATMENT OF UNCLASSIFIED CLAIMS**

**2.1      Allowed Administrative Expense Claims**. Subject to the provisions contained in Section 2.2 of this Plan, unless otherwise agreed to in writing by the Reorganized Debtor and the holder of an Allowed Administrative Expense Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) for Ordinary Course Administrative Expense Claims, when such Claims are due and payable in the ordinary course of the Debtor's business, (c) thirty (30) days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and (d) the date the Reorganized Debtor is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of this Plan and any orders of the Bankruptcy Court relating thereto.

**2.2      Requests for Allowance of Administrative Expense Claims**. Except as expressly set forth to the contrary in this Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following Subsections:

-20-

**a.**    **Professionals**. All Professionals shall file a final application for the allowance of a Professional Fee Claim on or before forty (40) days following the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor, counsel for the Committee, the UST and the requesting Professional no later than twenty (20) days after the filing of the applicable application for allowance of the Professional Fee Claim.

**b.**    **Other Administrative Expense Claimants**. All holders of Administrative Expense Claims other than Professionals shall file a request for payment of an Administrative Expense Claim with the Bankruptcy Court on or before forty (40) days following the Effective Date. Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request for payment by such deadline shall be forever barred from asserting such Claims against the Debtor, the Reorganized Debtor or their respective property and assets (whether cash or otherwise). Notwithstanding the foregoing, holders of Ordinary Course Administrative Expense Claims do not need to file with the Bankruptcy Court a request for payment of an Administrative Expense Claim, but rather may be paid in the ordinary course.

**2.3**    **Allowed Priority Tax Claims**. Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Priority Tax Claim and the Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall be paid a value, as of the Effective Date, equal to the unpaid portion of such Allowed Priority Tax Claim in equal quarterly cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.

**2.4**    **Other Provisions Concerning Treatment of Priority Tax Claims**. Notwithstanding the provisions of Section 2.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code. Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to

-21-

treatment in Class 12 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

**2.5     DIP Loan Claim**. The DIP Facility Claims shall be deemed to be Allowed Claims including all principal, accrued and accruing postpetition interest, costs, fees and expenses. In full and final satisfaction, settlement, release, and discharge of the Allowed DIP Facility Claims, and except to the extent the DIP Lender agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, the DIP Facility Claims shall be paid in full in Cash by the Reorganized Debtor with proceeds from the Exit Facility.

**2.6     Payment of Statutory Fees**. All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid in full in Cash by the Debtor on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable in accordance with <u>Section 6.12</u> hereof.

**ARTICLE III**

**<u>CLASSES OF CLAIMS AND INTERESTS</u>**

All Claims and Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in the following Classes. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims and Claims for statutory fees have not been classified and thus are excluded from the following Classes.

**3.1     Class 1 (Priority Non-Tax Claims)** shall consist of all Priority Non-Tax Claims.

**3.2     Class 2 (Pre-Petition First Lien Claim)** shall consist of the Claim of the Pre-Petition First Lien Lender under its Pre-Petition Senior Loan Documents.

**3.3     Class 3 (Pre-Petition Second Lien Claim)** shall consist of the Claim of the Pre-Petition Second Lien Lender under its Pre-Petition Senior Loan Documents.

**3.4     Class 4 (Grid Secured Claim)** shall consist of the Grid Secured Claim, *i.e.*, the Claim of Grid under the Grid Subordinated Secured Notes.

-22-

**3.5**     **Class 5 (LFT Secured Claim)** shall consist of the Claim of the LFT Secured Claim, *i.e.*, the LFT under the LFT Subordinated Secured Notes.

**3.6**     **Class 6 (JBJK Secured Claim)** shall consist of the JBJK Secured Claim, *i.e.*, the Claim of JBJK under the JBJK Subordinated Secured Notes.

**3.7**     **Class 7 (Gilbert Trust Secured Claim)** shall consist of the Gilbert Trust Secured Claim, *i.e.*, the Claim of Gilbert Trust under the Gilbert Trust Subordinated Secured Note.

**3.8**     **Class 8 (Trilliant Secured Claim)** shall consist of the Trilliant Secured Claim, *i.e.*, the Claim of Trilliant under the Trilliant Subordinated Secured Notes.

**3.9**     **Class 9 (Secured Tax Claims)** shall consist of all Secured Tax Claims.

**3.10**   **Class 10 (Other Secured Claims)** shall consist of all Other Secured Claims.

**3.11**   **Class 11 (General Unsecured Claims)** shall consist of all General Unsecured Claims against the Debtor.

**3.12**   **Class 12 (Interests)** shall consist of all Interests in the Debtor.

### ARTICLE IV

### IDENTIFICATION OF IMPAIRED CLASSES AND VOTING CLASSES

**4.1**     **Impaired Classes of Claims Entitled to Vote**. Holders of Claims or Interests in each Impaired Class are entitled to vote as a Class to accept or reject this Plan, other than Classes that are deemed to accept or reject this Plan as provided in Sections 4.2 and 4.3 herein.  Accordingly, the votes of holders of Claims or Interests in Classes 2 through 8 and Classes 10 through 11 shall be solicited with respect to this Plan.

**4.2**     **Class Deemed to Accept the Plan**. Classes 1 and 9 are Unimpaired by this Plan. Accordingly, under § 1126(f) of the Bankruptcy Code, holders of Claims in these Classes are conclusively deemed to have accepted this Plan, and the votes of such holders will not be solicited.

**4.3**     **Class Deemed to Reject the Plan**. Holders of Interests in Class 12 are not receiving or retaining any property under the Plan on account of such Interests and,

-23-

1   therefore, are conclusively deemed to have rejected the Plan. Accordingly, holders of

2   Interests in Class 12 are not entitled to vote on the Plan.

3       **4.4     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the

4   extent that any Impaired Class entitled to vote rejects the Plan or is deemed to have rejected

5   the Plan, the Debtor will request confirmation of this Plan, as it may be amended or modified

6   from time to time, under § 1129(b) of the Bankruptcy Code.

7       **4.5**     The Plan treats Secured Claims that are junior to the Pre-Petition Second Lien

8   Claim held by NDJR (Class 3)–specifically the Grid Secured Claim (Class 4), LFT Secured

9   Claim Class 5), JBJK Secured Claim (Class 6), Gilbert Trust Secured Claim (Class 7),

10  Trilliant Secured Claim (Class 8) and Other Secured Claims Class 10)–as Unsecured Claims

11  (Class 11) on the grounds that the allowed amount of the Pre-Petition Second Lien Claim

12  exceeds the aggregate value of the Debtor's assets.  Such treatment is dependent on the Court

13  determining, pursuant to the motion being separately filed by the Debtor pursuant to Section

14  506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, that the secured claims of each

15  of the Grid Secured Claim (Class 4), LFT Secured Claim Class 5), JBJK Secured Claim

16  (Class 6), Gilbert Trust Secured Claim (Class 7), Trilliant Secured Claim (Class 8) and Other

17  Secured Claims Class 10) are all valued at zero dollars ($0) (the 'Lien Stripping Motion')."

18                                      **ARTICLE V**

19                  **TREATMENT OF CLASSES OF CLAIMS AND INTERESTS**

20      **5.1     Treatment of Class 1 – Priority Non-Tax Claims**. Unless otherwise agreed

21  in writing by the Reorganized Debtor and the holder of an Allowed Priority Non-Tax Claim,

22  each holder of an Allowed Priority Non-Tax Claim will receive an amount equal to its

23  Allowed Priority Non-Tax Claim on the latest of (a) the Effective Date or as soon thereafter

24  as is practicable, (b) 30 days after the date on which such Priority Non-Tax Claim becomes

25  an Allowed Priority Non-Tax Claim by the entry of a Final Order, and (c) the date the

26  Reorganized Debtor is otherwise obligated to pay such Allowed Priority Non-Tax Claim in

27  accordance with the terms and provisions of the particular transactions giving rise to such

28

-24-

Claim, the terms and provisions of this Plan and any orders of the Bankruptcy Court relating thereto.

**5.2     Treatment of Class 2 – Pre-Petition First Lien Claim**. Notwithstanding any provisions of the Plan to the contrary, the Pre-Petition First Lien Secured Claim will be deemed Allowed, without offset, counterclaim or defense of any kind, in an amount equal to: (a) $86,366.69 on account of outstanding obligations as of the Petition Date, plus (b) all other Obligations under, and as defined in, the Pre-Petition First Lien Loan Agreement, including, without limitation, accrued and unpaid interest at the contract rate set forth in the Pre-Petition First Lien Loan Agreement through and including the Effective Date and the reasonable fees and expenses of counsel for the Pre-Petition First Lien Lender. In full and final satisfaction, settlement, release, and discharge of the Allowed Pre-Petition First Lien Claim, except to the extent that the Debtor or Reorganized Debtor, as applicable, and the holder of the Allowed Pre-Petition First Lien Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, the holder of the Allowed Pre-Petition First Lien Claim shall receive the following treatment: the amount of the Allowed Pre-Petition First Lien Claim shall be reduced to the principal amount portion of the Pre-Petition First Lien Claim in the amount specified in clause (a) of this Section 5.2 and the Reorganized Debtor shall pay such amount in Cash to the Pre-Petition First Lien Lender from the proceeds of the Exit Facility, with any balance of such Claim on account of the amount of the items set forth in clause (b) of this Section 5.2 to be discharged.

**5.3     Treatment of Class 3 – Pre-Petition Second Lien Claim**. Notwithstanding any provisions of the Plan to the contrary, the Pre-Petition Second Lien Secured Claim will be deemed Allowed, without offset, counterclaim or defense of any kind, in an amount equal to: (a) $16,273,098.82 on account of outstanding obligations as of the Petition Date, plus (b) all other Obligations under, and as defined in, the Pre-Petition Second Lien Secured Note, including, without limitation, accrued and unpaid interest at the contract rate set forth in the Pre-Petition Second Lien Secured Note through and including the Effective Date and

-25-

the reasonable fees and expenses of counsel for the Pre-Petition Second Lien Lender. On the Effective Date, the holder of the Allowed Pre-Petition Second Lien Claim shall receive the following treatment: (i) the portion of the Pre-Petition Second Lien Claim equal to the Settled Pre-Petition Second Lien Debt Amount shall be fully and finally satisfied, settled, released and discharged through the receipt by the Pre-Petition Second Lien Lender of the New Common Stock in the Reorganized Debtor pursuant to the Debt-For-Equity Exchange as provided for in the Plan, and (ii) with respect to the Non-Settled Pre-Petition Second Lien Debt Amount, the holder of the Pre-Petition Second Lien Claim shall retain such Claim to the extent of such amount and the Reorganized Debtor shall continue to be liable for such Claim to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount in accordance with the Pre-Petition Senior Loan Documents governing the Pre-Petition Second Lien Claim (as may be modified by the holder of the Pre-Petition Second Lien Claim and the Reorganized Debtor), subject to the following: (i) the maturity date for the repayment of the Non-Settled Pre-Petition Second Lien Debt Amount shall be the fifth (5th) anniversary of the Effective Date; (ii) interest shall accrue on the principal amount of such Claim at the non-default rate of six and a half percent (6.5%) per annum, which interest, rather than being paid in Cash, may be (at the option of the Reorganized Debtor) capitalized and added to the principal amount of the Claim; (iii) the holder of the Pre-Petition Second Lien Claim shall retain its Liens securing such Claims to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount; and (iv) any defaults that existed with respect to such Claim as of the Petition Date shall be deemed cured.

**5.4    Treatment of Class 4 – Grid Secured Claim**. Subject to the Court's determination of the Lien Stripping Motion, the Class 4 Grid Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.5    Treatment of Class 5 – LFT Secured Claim**. Subject to the Court's determination of the Lien Stripping Motion, the Class 5 LFT Secured Claim shall be deemed

to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.6     Treatment of Class 6 – JBJK Secured Claim**. Subject to the Court's determination of the Lien Stripping Motion, the Class 6 JBJK Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.7     Treatment of Class 7 – Gilbert Trust Secured Claim**. Subject to the Court's determination of the Lien Stripping Motion, the Class 7 Gilbert Trust Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.8     Treatment of Class 8 – Trilliant Secured Claim**. Subject to the Court's determination of the Lien Stripping Motion, the Class 8 Trilliant Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.9     Treatment of Class 9 – Secured Tax Claims**. Pursuant to § 1129(a)(9)(D) of the Bankruptcy Code, unless otherwise agreed in writing by the holder of a Secured Tax Claim and the Reorganized Debtor, each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim and shall be paid a value as of the Effective Date equal to the unpaid portion of such Allowed Secured Tax Claim in equal quarterly Cash payments beginning on the final day of the first full quarter after the Effective Date and ending five years after the Petition Date.

**5.10   Treatment of Class 10 – Other Secured Claims**. Subject to the Court's determination of the Lien Stripping Motion, each Class 10 Other Secured Claim shall be deemed to be an Unsecured Claim and shall be treated as a Class 11 General Unsecured Claim, in which case the holder of such Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim the treatment of a Class 11 General Unsecured Claim.

**5.11   Treatment of Class 11 – General Unsecured Claims** Each holder of an Allowed Class 11 General Unsecured Claim shall receive, on account of such Allow Claim, distributions from the Creditors Account on a Pro Rata basis.  In the event that the Debtor does not achieve profitability within the five-year Measuring Period, then no Tax Benefit will be realized by the Debtor; the Debtor will have no obligation to fund the Creditors Account; and holders of Class 11 claims will receive no distributions under the Plan.  No interest, penalty, or late charge is to be allowed on any Claim for the purpose of computing the distributions to the holders of Allowed General Unsecured Claims.  For each year during the Measuring period, the Debtor will either (i) make distributions required under the Plan, or (ii) if no distributions are required under the Plan, provide notice of that fact to all holder of Claims in Class 11 who file in the Chapter 11 Case and serve on the Debtor or the Reorganized Debtor, as applicable, a request for notice, no later than December 31 of the following year.

**5.12   Treatment of Class 12 – Interests**. On the Effective Date, the Interests in the Debtor shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Interests in the Debtor shall neither receive any distributions nor retain any property under this Plan for or on account of such Interests.

**ARTICLE VI**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**6.1   Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor**. As of the Effective Date, the Reorganized Debtor shall exist as a corporate entity in accordance with applicable law pursuant to its Amended Certificate of Incorporation and

-28-

Bylaws. Except as otherwise provided in this Plan, on and after the Effective Date, all Property of the Estate, including all claims, rights and Causes of Action, shall vest in the Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of Property and compromise or settle any Claims without supervision of or approval of the Bankruptcy Court free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

**6.2    Corporate Action**. Each of the matters provided for under this Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of the Debtor or the Reorganized Debtor.

**6.3    Certificate of Incorporation and Bylaws**. On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtor shall file with the Secretary of State of the State of Delaware, in accordance with the Delaware General Corporation Law, the Amended Certificate of Incorporation and Bylaws. The Amended Certificate of Incorporation and Bylaws shall become the Amended Certificate of Incorporation and Bylaws of the Reorganized Debtor. The Amended Certificate of Incorporation and Bylaws for the Reorganized Debtor shall be included in the Plan Supplement.

**6.4    Release of Liens**. Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and upon payment as provided in this Plan, all mortgages, deeds of trust, Liens or other security interests against the property of the Estate

-29-

vesting in the Reorganized Debtor will be fully released and discharged. The Reorganized Debtor shall be authorized to file or record on behalf of creditors such Uniform Commercial Code termination statements, real property releases or reconveyances, or other documents or instruments as may be necessary to implement the provisions of this Section 6.4. For the avoidance of doubt, the Pre-Petition Second Lien Claim to the extent of the Non-Settled Pre-Petition Second Lien Debt Amount are not released under the Plan.

**6.5    Cancellation of Interests and Authorization and Issuance of New Stock.**

**a.**    On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall issue the New Common Stock to be distributed to NDJR pursuant to the Plan without any further act or action by any other party under applicable law, regulation, order or rule. The issuance of the New Common Stock and the distribution thereof under the Plan shall be exempt from registration under the Securities Act of 1933, the Bankruptcy Code and applicable state securities laws. All documents, agreements and instruments entered into, on or as of the Effective Date contemplated by or in furtherance of the Plan, including the Exit Financing Agreement and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

**b.**    All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

**6.6    The Exit Facility.**

**a.**    On the Effective Date and simultaneously with the vesting of the Debtor's assets in the Reorganized Debtor, the Reorganized Debtor shall enter into the Exit Financing Agreement with the Exit Facility Lender and any related documents required by the Exit Facility Lender. Confirmation of the Plan shall be deemed to constitute approval of the Exit Facility and the Exit Facility documents and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtor to enter into and perform its obligations in connection with the Exit Facility without the need for any further action.

-30-

      **b.**    The main terms of the Exit Facility shall be as of the Effective Date as follows:

         i.    A multiple draw term loan in the principal amount of Exit Facility Amount.

         ii.    The maturity date of the Exit Facility shall be the fifth (5th) anniversary of the Effective Date.

         iii.    The non-default interest rate shall be five percent (5%) per annum, and the default rate shall accrue upon the occurrence of an event of default thereunder shall be seven percent (7%) per annum.

         iv.    The Exit Facility shall be secured by first priority Liens on, and security interests in, all of the Reorganized Debtor's right, title and interest, both legal and equitable, in real and personal property, tangible and intangible, wherever located and however acquired, subject to the terms of the Exit Facility documents.

      **c.**    On the Effective Date, the Exit Facility documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor and the non-Debtor parties to the Exit Facility documents, enforceable in accordance with their terms. Pursuant to the Plan, the financial accommodations to be extended pursuant to the Exit Facility documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

      **d.**    The Liens securing the Reorganized Debtor's obligations under the Exit Facility shall constitute first priority perfected liens and security interests on all of the tangible, real and personal, assets of Reorganized Debtor to the extent provided in the Exit Facility documents (subject to only the Liens securing the Non-Settled Pre-Petition Second

-31-

Lien Debt Amount). On the Effective Date, all of the Liens securing the Exit Facility (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility documents, (2) shall be deemed automatically perfected on the Effective Date, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

**e.** The Reorganized Debtor and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**6.7** **Provisions Relating to Post-Confirmation Administration of the Reorganized Debtor.**

**a.** **Board of Directors**. As of the Effective Date, the Board of Directors shall be the governing body of the Reorganized Debtor until such time as a shareholders' meeting occurs pursuant to the Organizational Documents or applicable non-bankruptcy law, and shall assume the governance of the Reorganized Debtor including, but not limited to, determining who shall serve as the Reorganized Debtor's Officers, supervisors, managers and executive employees.

    **b.**  **Identity of Board of Directors**. On the Effective Date, the term of the current members of the board of directors of the Debtor, if any, will expire. The identity of the initial members of the Board of Directors shall be included in the Plan Supplement.

    **c.**  **Other Provisions**. Other provisions governing the service, term and continuance in office of the members of the Board of Directors shall be set forth in the Organizational Documents of the Reorganized Debtor.

  **6.8**  **Disbursing Agent**. On the Effective Date, the Reorganized Debtor shall have the authority to serve as, or appoint, the Disbursing Agent to carry out the duties set forth in this Plan. The Reorganized Debtor shall have the authority to replace the Disbursing Agent at any time, with or without cause, subject to the terms of any agreement between the Reorganized Debtor and the Disbursing Agent. The Reorganized Debtor shall file any agreement with the Disbursing Agent with the Bankruptcy Court and serve such agreement on the United States Trustee.

  **6.9**  **Closing of Case**. If, after the Effective Date, the Chapter 11 Case is closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of this Plan, (b) shall not affect any rights of the Debtor, the holders of Claims or Interests or the treatment of any other Person under this Plan, (c) shall continue to cause the terms of this Plan to remain binding on all Persons, (d) shall cause all orders of the Bankruptcy Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article XII of this Plan.

  **6.10**  **Effectuating Documents; Further Transactions**. The chief executive officer, the chief financial officer, chairman of the Debtor's board of directors or any other executive officer of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The secretary or assistant secretary of the Debtor shall be authorized to certify or attest to any of the foregoing actions.

**Exhibit A**
**Page 102**

**6.11    Withholding and Reporting Requirements**. In connection with this Plan, the Reorganized Debtor shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) be authorized to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to this Plan.

**6.12    Quarterly Reports and United States Trustee's Fees**. The Reorganized Debtor shall have the obligation to file quarterly reports in the format prescribed by the United States Trustee and pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), which obligation shall end upon entry of a final decree or other order closing the Chapter 11 Case.

**6.13    Preservation of Causes of Action.**

      **a.    Vesting of Causes of Action**. In accordance with § 1123(b) of the Bankruptcy Code, except as otherwise provided in this Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all claims and Causes of Action held by the Debtor and/or the Estate, whether arising before or after the Petition Date. All such claims and Causes of Action, along with all rights, interests and defenses related thereto, shall vest with the Reorganized Debtor.

      **b.    Reservation of Causes of Action**. Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, and except as to the Pre-Petition Senior Lenders, the Debtor and the Reorganized Debtor specifically reserve all Causes of Action, for later adjudication. Therefore, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the Causes of Action upon, after or as a consequence of the confirmation, the Effective Date or consummation of this Plan. Without limiting the foregoing, the Causes of Action reserved under the Plan include the Causes of Action disclosed in the Debtor's

-34-

Schedules against (i) Trilliant (breach of contract regarding license agreement; breach of contract for failure to purchase promissory notes pursuant to its letter agreement with the Debtor to purchase promissory notes issued by the Debtor); (ii) Vula Telematix (Pty) Ltd. (nonpayment for 3 years, breach of contract, damages in the amount of $41,000); (iii) rpmaNetworks aka MEC Telematik FZ LLC corporation (unpaid licenses, breach of contract, damages in the amount of $8 million); (iv) Wuxi Jiuzhou Communications Technology Co., Ltd (nonpayment, breach of contract, damages in the amount of $384,754); (v) Totum Labs (https://totumlabs.com/) for patent infringement and (vi) the Debtor's former officers and directors, including John Horn and Ted Myers, for breaches of fiduciary duties, negligence, misappropriation and related claims; (vi) RPMA International Corp (triggered escrow release without cause and nonpayment, breach of contract, damages in the amount of $7,808); (vii) JBJK (breach of contract for failure to purchase promissory notes pursuant to its note and warrant purchase agreement with the Debtor to purchase promissory notes issued by the Debtor) and (viii) LFT (breach of contract for failure to purchase promissory notes pursuant to its note and warrant purchase agreement with the Debtor to purchase promissory notes issued by the Debtor). In addition, the Causes of Action reserved under the Plan included any Causes of Action regarding any transfers disclosed in the Debtor's s Statement of Financial Affairs ("**SOFA**"), including Avoidance Actions.

   **c.** **Preservation of Defensive Use of Causes of Action**. Whether or not any Cause of Action is pursued or abandoned, the Debtor and the Reorganized Debtor reserve their rights to use any such Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to § 502(d) of the Bankruptcy Code or otherwise.

   **d.** **Discretion to Pursue or Settle**. The Reorganized Debtor shall have discretion to pursue or not to pursue, to settle or not to settle, to try or not to try, and/or to appeal or not to appeal all Causes of Action.

   **6.14** **No Liability for Solicitation or Participation.**

-35-

**Exhibit A**
**Page 104**

As specified in § 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sales, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 6.15    Exemption from Certain Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the Exit Facility liens and any transfer from a Debtor to a Reorganized Debtor or to any Person pursuant to, in contemplation of, or in connection with this Plan, shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning of any contract, lease or sublease; (3) any transaction authorize by this Plan; (4) any sale of an asset by the Reorganized Debtor in furtherance of the Plan, including but not limited to any sale of personal or real property; and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan.

-36-

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1**     **Distributions**. Subject to Bankruptcy Rule 9010, all distributions under this Plan shall be made by the Disbursing Agent pursuant to the terms and conditions contained in this Plan.

**7.2**     **Distributions of Cash**. All distributions of Cash to be made by the Disbursing Agent pursuant to this Plan shall be made by a check or wire transfer from the Disbursing Agent's account maintained in accordance with this Plan.

**7.3**     **Effective Date Payments**. On or as soon as practicable after the Effective Date, the New Common Stock shall issue as described in this Plan. For the first year in which funds are deposited into the Creditors Account, the Disbursing Agent shall make the initial distributions as soon as practicable thereafter (the "**Initial Distribution Date**") to those entitled to distribution in accordance with the terms and provisions of the Plan. For each year thereafter, if and when funds are deposited in the Creditors Account for such year, the Disbursing Agent shall make distributions as soon as practicable thereafter (a "**Subsequent Distribution Date**") to those entitled to distribution in accordance with the terms and provisions of the Plan.

**7.4**     **Delivery of Distributions and Undeliverable Distributions**. Distributions to the holder of an Allowed Claim or Interest shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing within six months of the distribution date of such holder's then current address, at which time all distributions shall be made to such holder, without interest. All claims for undeliverable distributions shall be made within six months after the date such undeliverable distribution was initially made. If any claim for an undeliverable distribution is not timely made as provided herein, such claim shall be forever

-37-

barred with prejudice. After such date, all unclaimed property (a) shall be applied first to satisfy the costs of administering and fully consummating this Plan, then shall be transferred to the Reorganized Debtor and available to be used for general corporate purposes, including working capital, and (b) the holder of any such Claim or Interest shall not be entitled to any other or further distribution under this Plan on account of such undeliverable distribution or such Claim or Interest.

**7.5    Time Bar to Cash Payments and Disallowances**. Checks issued by the Disbursing Agent in respect of Allowed Clams shall be void if not negotiated within three months after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of three months following the date of issuance of such check. After such date, (a) all funds held on account of such void check shall be applied first to satisfy the costs of administering and fully consummating this Plan, then will be available to the Reorganized Debtor to be used for general corporate purposes, including working capital, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further distribution on account of such Claim.

**7.6    Minimum Distributions**. If a distribution to be made to a holder of an Allowed Claim on any Distribution Date would be $25.00 or less, notwithstanding any contrary provision of this Plan, no distribution will be made to such Claimant. In addition, no fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.

**7.7    Transactions on Business Days**. If the Effective Date or any other date on which a transaction, event or act may occur or arise under this Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by this Plan to occur on such day shall instead occur on the next day which is a Business Day.

-38-

7.8     **Distributions after Allowance**. Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed or estimated for distribution purposes, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

7.9     **Disputed Payments**. If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any distribution, the Disbursing Agent may, in lieu of making such distribution to such Person, make such distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

7.10    **No Distributions in Excess of Allowed Amount of Claim**. Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim.

**ARTICLE VIII**

**PROCEDURES REGARDING DISPUTED CLAIMS**

8.1     **Objections to Claims.**

a.      The Reorganized Debtor shall have the exclusive right to object to Claims after the Effective Date including, but not limited to, objections regarding the allowance, classification or amount of Claims, subject to the procedures and limitations set forth in this Plan, the Bankruptcy Rules, and the Bankruptcy Code; provided, however, that the deadline for the Reorganized Debtor to file objections to Claims shall be one hundred eighty (180) days after the Effective Date, unless further extended by the Bankruptcy Court upon notice to all creditors and holders of equity interests requesting notice pursuant to Bankruptcy Rule 2002. All such objections shall be litigated to a Final Order except to the extent the Reorganized Debtor, in its sole discretion, elects to withdraw any such objection or compromise, settle or otherwise resolve any such objection, in which event the Reorganized Debtor may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

-39-

    **b.**    Unless any objection to a Claim is expressly waived, relinquished, released, compromised or settled in this Plan or a Final Order, the Debtor and the Reorganized Debtor specifically reserve all such objections, including without limitation objections to the amount or validity of any Claim. The Debtor has not yet completed its analysis into and investigation of the Claims and objections thereto. Accordingly, no preclusion doctrine, estoppel (judicial, equitable or otherwise) or laches shall apply to any objection to any Claim upon, after or as a consequence of the confirmation, the Effective Date or consummation of this Plan.

**8.2**    **No Distributions Pending Determination of Allowance of Disputed Claims**. No distributions shall be made under this Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim.

**8.3**    **Reserve Accounts for Disputed Claims**. On or prior to the Initial Distribution Date and each Subsequent Distribution Date, the Disbursing Agent shall reserve Cash in an aggregate amount sufficient to pay each holder of a Disputed Claim (a) the amount of Cash that such holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim on such Distribution Date or (b) such lesser amount as the Bankruptcy Court may estimate or may otherwise order (the "**Disputed Claims Reserve**").

**8.4**    **Investment of Disputed Claims Reserve**. The Disbursing Agent shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills (or in a fund that invests substantially all of its assets in United States Treasury securities), interest-bearing certificates of deposit, tax exempt securities or investments permitted by § 345 of the Bankruptcy Code, with the concurrence of the Board of Directors or as otherwise authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate risk. All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of the Disputed Claims Reserve and shall be retained the Reorganized Debtor.

-40-

**8.5    Allowance and Payment of Disputed Claims**. If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall, within thirty (30) days after the date on which such Disputed Claim becomes an Allowed Claim or as soon thereafter as is practicable, distribute from the Disputed Claims Reserve to the holder of such Allowed Claim the amount of distributions that such holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim on the Effective Date.

**8.6    Release of Excess Funds from Disputed Claims Reserve**. If at any time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims Reserve in an amount in excess of the amount which the Disbursing Agent is required at such time to reserve on account of Disputed Claims under this Plan or pursuant to any order of the Bankruptcy Court, the Disbursing Agent may release such funds from the Disputed Claims Reserve to the Reorganized Debtor.

**8.7    Estimation**. The Debtor or the Reorganized Debtor, as the case may be, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor, as the case may be, have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims that have been estimated subsequently may be compromised, settled, withdrawn or otherwise resolved without further order of the Bankruptcy Court as provided in <u>Section 8.1</u> of this Plan.

## ARTICLE IX

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1    Rejection of Executory Contracts and Unexpired Leases**. Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases that exist between the Debtor and any Person shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed (including a motion seeking an order authorizing, but not directing, the Debtor to assume, assume and assign, or reject such Executory Contract or Unexpired Lease) prior to the Effective Date, or (iii) agreed to be excluded from such rejection pursuant to stipulation with the Debtor or the Reorganized Debtor. or (iv) that is identified on the Plan Supplement as being excluded from such rejection. Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("**Rejection Claims**") shall be classified in Class 11 under this Plan. For the avoidance of doubt, the foregoing shall apply to the Trilliant Contract to the extent a determination is made that, contrary to the Debtor's position, the Debtor's termination of the Trilliant Contract prior to the Petition Date was not effective, in which case the Trilliant Contract shall either (1) be deemed rejected pursuant to the Plan, and Trilliant may assert continued rights in the Debtor's intellectual property under section 365(n) of the Bankruptcy Code, or (2) be the subject of continued litigation regarding whether the Trilliant Contract is subject to termination as a result of pre-petition and continuing breaches, and the consequences of such termination. For further avoidance of doubt, (a) the Debtor asserts that it effectively terminated the Trilliant Contract prior to the Petition Date based on certain breaches by Trilliant (the 'Pre-Petition Termination'), and therefore, the Trilliant Contract is not an Executory Contract; (b) Trilliant contends that the purported Pre-Petition Termination was ineffective as the Trilliant Contract required

-42-

a 60-day notice and cure period; (c) the Debtor contends that such notice and cure period was inapplicable as certain of Trilliant's breaches were and are incurable; (d) Trilliant disputes that such notice and cure period was inapplicable because certain of Trilliant's breaches were allegedly incurable; (e) Trilliant commenced Adversary Proceeding No. 20-90108 seeking a judicial determination of this and other related issues; (f) the Debtor reserves the right to assert that existing breaches, and/or other and further breaches, give rise to the right to terminate the Trilliant Contract even if the Pre-Petition Termination was not effective (the "Post-Petition Termination"); and (g) Trilliant reserves all rights to dispute such purported Post-Petition Termination.

**9.2    Bar Date for Filing Rejection Claims**. A Proof of Claim asserting a Rejection Claim shall be filed with the Bankruptcy Court on or before the fortieth (40th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Reorganized Debtor.

**ARTICLE X**

**CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN**

**10.1    Conditions to the Effective Date**. The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.2 of this Plan:

**a.**    The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to the Debtor and the Exit Facility Lender, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, this Section 10.1(a) shall be deemed satisfied;

-43-

      **b.**     All actions, documents and agreements necessary to implement this Plan shall be in form and substance reasonably satisfactory to the Exit Facility Lender and the Debtor and shall have been effected or executed as applicable; and

      **c.**     The Exit Facility Lender and the Debtor shall have executed the Exit Financing Agreement.

    **10.2**   **Waiver of Conditions**. The conditions set forth in <u>Section 10.1</u> of this Plan may be waived by the Debtor and the Exit Facility Lender, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

**ARTICLE XI**

**<u>EFFECT OF CONFIRMATION</u>**

    **11.1**   **DISCHARGE OF THE DEBTOR**. PURSUANT TO § 1141(D) OF THE BANKRUPTCY CODE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, THE RIGHTS AFFORDED AND THE PAYMENTS AND DISTRIBUTIONS TO BE MADE AND THE TREATMENT UNDER THE PLAN SHALL BE IN COMPLETE EXCHANGE FOR, AND IN FULL AND UNCONDITIONAL SETTLEMENT, SATISFACTION, DISCHARGE, AND RELEASE OF ANY AND ALL EXISTING DEBTS AND CLAIMS AND TERMINATION OF ALL INTERESTS OF ANY KIND, NATURE, OR DESCRIPTION WHATSOEVER AGAINST OR IN THE DEBTOR, THE REORGANIZED DEBTOR, THEIR PROPERTY, THE DEBTOR'S ASSETS, OR THE ESTATE, AND SHALL EFFECT A FULL AND COMPLETE RELEASE, DISCHARGE, AND TERMINATION OF ALL LIENS, SECURITY INTERESTS, OR OTHER CLAIMS, INTERESTS, OR ENCUMBRANCES UPON ALL OF THE DEBTOR'S ASSETS AND PROPERTY. FURTHER, ALL PERSONS ARE PRECLUDED FROM ASSERTING, AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS, OR ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR INTERESTS BASED UPON ANY ACT,

-44-

OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE, OTHER THAN AS EXPRESSLY PROVIDED FOR IN THE PLAN, OR THE CONFIRMATION ORDER, WHETHER OR NOT (A) A PROOF OF CLAIM BASED UPON SUCH DEBT IS FILED OR DEEMED FILED UNDER § 501 OF THE BANKRUPTCY CODE; (B) A CLAIM BASED UPON SUCH DEBT IS ALLOWED; OR (C) THE CLAIMANT BASED UPON SUCH DEBT HAS ACCEPTED THE PLAN.

**11.2   INJUNCTION**. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL CLAIMANTS AND HOLDERS OF INTERESTS ARISING PRIOR TO THE EFFECTIVE DATE SHALL BE PERMANENTLY BARRED AND ENJOINED FROM ASSERTING AGAINST THE REORGANIZED DEBTOR OR THE DEBTOR, OR THEIR SUCCESSORS OR PROPERTY, OR THE DEBTOR'S ASSETS, ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH CLAIM OR INTEREST: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING ON ACCOUNT OF SUCH CLAIM AGAINST OR INTEREST IN THE REORGANIZED DEBTOR, THE DEBTOR, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN TO ENFORCE ANY RIGHT TO DISTRIBUTION WITH RESPECT TO SUCH PROPERTY UNDER THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTOR, THE DEBTOR OR ANY OF THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN AS PERMITTED UNDER SUB-PARAGRAPH (I) ABOVE; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST PROPERTY OF THE REORGANIZED DEBTOR, THE DEBTOR, OR ANY PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR,

-45-

THE REORGANIZED DEBTOR, THEIR ASSETS OR ANY OTHER PROPERTY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN. THE FOREGOING DISCHARGE, RELEASE AND INJUNCTION ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION. THE DEBTOR AND THE REORGANIZED DEBTOR SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK THE ENFORCEMENT OF THE DISCHARGE, RELEASE AND INJUNCTION SET FORTH IN THIS ARTICLE XI.

**11.3    No Waiver of Discharge**. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtor upon confirmation of the Plan by § 1141 of the Bankruptcy Code.

**11.4    Binding Effect**. As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and holders of Interests, other parties-in-interest and their respective heirs, successors, and assigns.

**11.5    Term of Injunctions or Stays**. Unless otherwise provided in this Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time they are replaced with the injunction set forth in Section 11.1 of the Plan.

**11.6    Setoffs**. Except with respect to Claims specifically Allowed under the Plan, the Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against such Claimant; but neither the failure to do so nor the allowance of any Claim

-46-

hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Claimant.

## ARTICLE XII

## RETENTION OF JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case, this Plan and the Confirmation Order pursuant to, and for the purposes of, §§ 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

**a.**    to determine the allowance or classification of Claims and to hear and determine any objections thereto;

**b.**    to determine any and all motions, adversary proceedings, applications, contested matters and other litigated matters under the Bankruptcy Code or arising in or related to the Chapter 11 Case that may be pending in the Bankruptcy Court on, or initiated after, the Effective Date;

**c.**    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

**d.**    to issue such orders in aid of the execution, implementation and consummation of this Plan to the extent authorized by § 1142 of the Bankruptcy Code or otherwise;

**e.**    to construe and take any action to enforce this Plan;

**f.**    to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

**g.**    to modify this Plan pursuant to § 1127 of the Bankruptcy Code, or to remedy any apparent non-material defect or omission in this Plan, or to reconcile any non-material inconsistency in this Plan so as to carry out its intent and purposes;

**h.**    to hear and determine all applications for compensation and reimbursement of expenses of Professionals under §§ 328(a), 330, 331, 333, 503(b) or 1103 of the Bankruptcy Code;

-47-

**i.**     to determine any requests for payment of Priority Tax Claims, Priority Non-Tax Claims or Administrative Expense Claims;

**j.**     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

**k.**     to consider and act on the compromise and settlement or payment of any Claim against the Debtor, the Reorganized Debtor or the Estate;

**l.**     to recover all assets of the Debtor and property of the Estate, wherever located;

**m.**     to hear and determine Causes of Action brought by the Reorganized Debtor; provided, however, that nothing in the retention of jurisdiction under this clause (m) shall be construed as a determination that the Bankruptcy Court has or does not have jurisdiction to hear and determine any Causes of Action;

**n.**     to determine all questions and disputes regarding title and/or ownership to the assets of the Debtor, the Reorganized Debtor or the Estate;

**o.**     to issue injunctions, enter and implement other orders or to take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of this Plan or the Confirmation Order;

**p.**     to remedy any breach or default occurring under this Plan;

**q.**     to resolve and finally determine all disputes that may relate to, impact on or arise in connection with this Plan;

**r.**     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**s.**     to hear any other matter consistent with the provisions of the Bankruptcy Code; and

**t.**     to enter a final decree closing the Chapter 11 Case.

-48-

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1   Modification of Plan**. The Debtor may propose amendments to or modifications of this Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order. After the Confirmation Date, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in this Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of this Plan so long as the interests of Claimants are not materially and adversely affected.

**13.2   Extensions of Time**. Notwithstanding any time limitation in this Plan, the Bankruptcy Court may, pursuant to a motion filed with the Bankruptcy Court prior to the expiration of such time limitation and for good cause shown, extend such time limitation.

**13.3   Releases and Related Matters.**

**a.      Releases by Holders of Claims for Post-Petition Conduct**.

As of the Effective Date, in consideration for the obligations of the Debtor and the Reorganized Debtor under the Plan and the cash and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce obligations under or reserved by the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder and the right to contest Professional Fee Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place after the Petition Date and through the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the Plan that such Person has, had or may have against (i) the Debtor, (ii) the Debtor's directors, officers, employees, agents and attorneys, (iii) the Committee and its agents, attorneys, and other professionals; (iv) the Pre-Petition Senior Lenders and their agents, attorneys, and other

-49-

professionals; (v) the DIP Lender and its employees, agents, attorneys and other professionals and (vi) the Exit Facility Lender and its employees, agents, attorneys and other professionals.

        **b.**      **Releases by the Debtor**.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and the Reorganized Debtor and any and all Persons claiming through or on behalf of the Debtor or the Reorganized Debtor including, without limitation, the Committee, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, except for acts or omissions which constitute willful misconduct or gross negligence, in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case or the Plan, and that may be asserted by the Debtor or its Estate or the Reorganized Debtor against (i) the Debtor's directors, officers, employees, agents and attorneys; (ii) the DIP Lender and its employees, agents, attorneys and other professionals; (iii) the Committee and its agents, attorneys, and other professionals; (iv) the Pre-Petition Senior Lenders and their agents, attorneys, and other professionals; and (v) the Exit Facility Lender and its employees, agents, attorneys and other professionals. The Debtor, the Reorganized Debtor, the Committee, the Pre-Petition Senior Lenders, and DIP Lender, and each of their respective agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts, and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided, however, that a determination that such reliance

-50-

is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

### c. Injunction Related to Releases.

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including pursuant to the releases in this Section 13.3.

**13.4   Dissolution of the Committee**. On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims. The Professionals retained by the Committee shall be entitled to compensation and reimbursement of (i) fees and expenses for services rendered through and including the date it is dissolved, and (ii) fees and expenses for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 2.2 of the Plan or any objections thereto.

**13.5   Default**. If the reorganized Debtor fails to make any payment, or to perform any other payment obligation required under the Plan, for more than thirty (30) days after the time specified in the Plan for such payment, any member of a Class affected by the default may serve upon the Reorganized Debtor a written notice of default. If the Reorganized Debtor fails within thirty (30) days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the Bankruptcy Court an extension of time to cure the default; or (iii) to obtain from the Bankruptcy Court a determination that no default occurred, then the Reorganized Debtor is in default with respect to such payment or obligation (a "**Material Default**") under the Plan. Notwithstanding the foregoing, a default or material default under the plan may be waived in writing by holders of more than 50% of the outstanding allowed amount of the affected Claim(s) not including claims held by insiders or former insiders or entities controlled by insiders or former insiders. Upon

-51-

Material Default, such member of such Class affected by the default: (i) may file and serve a motion to dismiss the Chapter 11 Case or to convert the Chapter 11 Case to Chapter 7; or (ii) seek from the Bankruptcy Court any other appropriate remedy. The United States Trustee is exempt from providing any notice of default prior to filing any motion if the Reorganized Debtor fails to file required post-confirmation reports or pay fees due and payable under 28 U.S.C. Section 1930.

  **13.6**  **Notices**. Any pleading, notice or other documents required by the Plan or the Confirmation Order to be served on or delivered to the Debtor, the Reorganized Debtor, or the Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to (and must also include email notice):

  If to the Debtor, to:

    Alvaro Gazzolo
    113 West G Street Suite 1686
    San Diego, CA 92101
    Attention: Alvaro Gazzolo
    Email: Alvaro.Gazzolo@ingenu.com

    and

    Sullivan Hill Rez & Engel
    600 B Street, 17th Floor
    San Diego, CA 92101
    Attention: Christopher V. Hawkins
    Telefacsimile: (619) 595-3218
    Email: hawkins@sullivanhill.com
    (Counsel to the Debtor)

  If to the Reorganized Debtor, to:

    Alvaro Gazzolo
    113 West G Street Suite 1686
    San Diego, CA 92101
    Attention: Alvaro Gazzolo
    Email: Alvaro.Gazzolo@ingenu.com

  If to the United States Trustee, to:

    Haeji Hong, Esq.
    OFFICE OF THE U.S. TRUSTEE
    402 W. Broadway, Ste. 600

1         San Diego, CA 92101
Email:

2         (United States Trustee)

3      **13.7**   **Choice of Law**. Except to the extent that (a) the Bankruptcy Code or other

4 federal statutes or regulations, or (b) the Delaware General Corporation Law, are applicable,

5 the rights and obligations arising under the Plan shall be governed by, construed, and

6 enforced in accordance with the laws of the State of California without giving effect to the

7 principles of conflict of laws thereof. In the event of an inconsistency between the terms of

8 this Plan and the laws of the State of California, the terms of this Plan shall prevail.

9      **13.8**   **Captions**. Paragraph captions used herein are for convenience only and shall

10 not affect the construction of this Plan.

11

12 Dated:  October 30, 2020     SULLIVAN HILL REZ & ENGEL

13                        A Professional Law Corporation

14                    By:    */s/ Christopher V. Hawkins*

15                         Christopher V. Hawkins

16                         Attorneys for Debtor and Debtor in Possession
INGENU INC.

17

18

19

20

21

22

23

24

25

26

27

28

-53-

**Exhibit B**

Class 9 - Secured Tax Claims

| Class 9 - Secured Tax Claims | Claim Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total** | **$0.00** |

Class 10 - Other Secured Claims

| Other Secured Claims - Class 10 | Claim Amount | Source |
|---|---|---|
| Snezana Stjepovic | $35,542.79 | Schedules |
| Frank Castaneda | $18,838.71 | Schedules |
| Travis Hornung | $21,291.28 | Schedules |
| William Simpson | $35,153.08 | Schedules |
| Hafiz Hameed | $28,364.94 | Schedules |
| Serrano, Lisa D | $10,207.23 | Schedules |
| TTM | $101,536.88 | Schedules |
| | | |
| **Total** | **$250,934.91** | |

Class 11 - General Unsecured Fees

| Class 11 - General Unsecured | Amount |
|---|---|
| Accruent | $29,490.00 |
| Aether Wind Technologies, Inc. | $6,000.00 |
| AIG Property Casualty, Inc. | $0.00 |
| Air802 | $236.00 |
| Akin Gump | $17,969.29 |
| Allied Business Intelligence, Inc. (ABI) | $40,999.00 |
| Altium Inc | $2,775.00 |
| Alvaro Gazzolo (Insider) | $192,307.80 |
| Alvaro Gazzolo - International Media Consultancy, Inc. (Insider) | $86,690.35 |
| American Tower Corporation   ATC | $533,928.49 |
| APS | $364.07 |
| Aramark | $3,382.59 |
| Arizona Department of Economic Security DES Unemployment Tax | $151.20 |
| Arizona Dept. of Revenue | $100.00 |
| AT & T Mobility CC | $24,833.50 |
| AT&T Mobility | $1,496.54 |
| Avant, Doug | $7,024.69 |
| Avison Young   Arizona, Ltd Avison Young | $31,986.34 |
| B&T Group Holdings, Inc | $2,400.00 |
| Babak Cyrus Razi (Insider) | $21,139.71 |
| BDO USA, LLP | $39,403.00 |
| BeneTrac | $1,200.00 |
| Beniquez, Saul | $8,006.79 |
| Bernalillo County Treasurer | $95.18 |
| BlueStream Professional Services, LLC | $148,126.65 |
| BLUMBERG LAW GROUP LLP | $31.20 |
| Bockenhauer, Marychello | $4,497.05 |
| Boesel, Rob | $14,240.45 |
| Builta, Joshua T | $3,535.19 |
| Bureau of the Treasury | $533.43 |
| Business Wire, Inc. | $2,750.00 |
| California Secretary of State | $25.00 |
| Canon | $2,868.03 |
| Carpenter, David | $7,553.31 |
| CCH Incorporated | $3,598.21 |
| Charney IP Law | $10,107.00 |
| Cintas Corporation No. 2 Cintas Corp/Cintas First Aid & Safe | $1,098.72 |
| City of Columbus DPU | $693.59 |
| City of Concord | $311.37 |
| CITY OF GARLAND  COREY WORSHAM RTA | $196.02 |
| City of Lake Worth | $178.34 |
| City of Mesa | $76.84 |
| City of Oceanside | $71.00 |
| City of Rock Hill | $171.56 |
| City of San Marcos Business Licensing | $61.00 |
| City of Scottsdale | $50.00 |
| Clarion Events Pte. Ltd. | $8,000.00 |
| Colleen Cleary | $64,810.80 |
| Columbus City Treasurer Electric Services | $306.63 |
| Compliance International | $1,325.00 |
| Concierge Cleaning Services | $6,185.14 |
| Conductive Containers, Inc. | $1,119.22 |
| Cooley LLP | $113,244.14 |

Class 11 - General Unsecured Fees

| Class 11 - General Unsecured | Amount |
|---|---|
| County of San Bernardino | $1,639.65 |
| Cox Communication San Diego | $2,316.64 |
| COX Communications Phoenix | $3,858.48 |
| CPA Global Limited | $31,015.23 |
| CPS Energy / City Public Service Board | $111.05 |
| Crown Castle USA Inc. | $1,975,304.12 |
| CT Corporation | $299.00 |
| DDH Enterprise, Inc | $336,050.05 |
| Delaware Secretary of State | $269,897.40 |
| Dell C/O DELL USA L.P. | $24,310.44 |
| Deloitte Tax LLP | $18,899.00 |
| Digi Key Corp | $497.44 |
| Digital Talent Agents, LLC dba Influence & Co. | $15,000.00 |
| Dominion Virginia Power | $1,108.52 |
| Doug S. Franke | $28,806.33 |
| Duke Energy | $2,172.70 |
| El Paso Electric | $86.23 |
| Electronic Surface | $12,011.38 |
| ElectSolve Technology Solutions & Svcs | $2,000.00 |
| Entergy Louisiana LLC | $210.79 |
| Entergy Louisiana LLC | $290.48 |
| Equihua, Nancy J | $14,001.57 |
| ESMI, Inc. | $8,588.13 |
| Espey, Dennis | $2,173.25 |
| Fabian Tucker | $115.17 |
| Faciliteq AZ LLC | $10,645.02 |
| Fang, Jianhong | $3,086.70 |
| Fang, Jianhong | $11,219.07 |
| FedEx | $52.60 |
| Ferderick Price | $3,169.70 |
| First Class Vending, Inc. | $3,259.85 |
| Flextronics International USA Inc | $1,274,482.19 |
| Flextronics Sales & Marketing Asia Pacific Ltd. | $1,274,482.19 |
| Foley & Lardner LLP | $254,789.81 |
| FPL/Bankruptcy Dept/RRDL/LFO | $501.67 |
| Franchise Tax Board | $44.00 |
| Freeman | $3,356.75 |
| Georgia Power | $360.67 |
| GetGo Inc. Subsidiary of LogMeIn Inc. | $7,273.11 |
| Gifford, Nick | $4,766.61 |
| GraphiCode Inc. | $1,020.00 |
| Guadalupe County | $195.20 |
| Hall, Brett | $5,222.00 |
| Hameed, Imran | $7,152.18 |
| Harold Jordan | $62,042.90 |
| Haulaway Storage Containers, Inc. | $728.00 |
| HealthEquity | $41.30 |
| Hiew, Loren | $2,297.37 |
| HiTem, Inc. | $549,315.10 |
| Hughes, Matthew | $15,587.28 |
| Humble Independent School District Tax Collector | $199.38 |
| iDeals Solution Group | $5,040.00 |
| iGOE | $417.00 |

Class 11 - General Unsecured Fees

| Class 11 - General Unsecured | Amount |
|---|---|
| Indeed, Inc | $291.69 |
| Indianapolis Power & Light Company | $536.30 |
| Innovative Metal Products, Inc. | $6,052.30 |
| Insulated Wire, Inc. | $8,637.38 |
| Internal Revenue Service (IRS) | $126,050.47 |
| Iron Mountain | $716.60 |
| Jordan & Company | $48,930.00 |
| Jordan, Cynthia M | $5,027.46 |
| Kaiser | $0.00 |
| Kang, Chaoming | $7,773.42 |
| KBSII Horizon Tech Center, LLC | $222,548.41 |
| Kish, David W | $5,429.56 |
| Koenig, Michelle | $3,836.36 |
| Krishnakumar, Sreelakshmi | $6,772.05 |
| Kumar, Rahul | $3,663.27 |
| Kupstas, Robert | $2,000.02 |
| Landsberg Orora | $2,376.00 |
| Lark Engineering, Inc. | $28,100.00 |
| Larry Gaddes PCAC, CTA William county Tax Collector | $1,037.16 |
| Latin America Regulatory Compliance Group, LLC | $3,875.00 |
| Law Office of Matthew J. Day PLLC | $33,889.32 |
| Level 3 Communications TW Telecom | $8,236.06 |
| Liberty Test Equipment, Inc. | $4,929.57 |
| Lighthorse Technologies, Inc. | $9,324.28 |
| Lightwave Broadband, LLC | $400.00 |
| Litle & Co | $3,055.00 |
| LKP Global Law, LLP | $46,924.19 |
| LogiSense Corporation | $174,876.84 |
| Manpower Temp Services | $3,067.73 |
| Marietta | $118.48 |
| Mark Malopy | $14,890.27 |
| Matthew Hughes | $238.65 |
| Md7, LLC | $63,950.00 |
| Memphis Light, Gas and Water Division | $270.68 |
| MetLife Small Business Center | $7,724.24 |
| MISSION FEDERAL CREDIT UNION | $96,902.00 |
| Mobile Mark, Inc. | $676.50 |
| Mouser Electronics, Inc. | $26.92 |
| Multek Technologies Limited | $5,200.00 |
| Mutual of Omaha c/o Sandy Schwennesen | $4,450.51 |
| Myers, Ted | $13,833.03 |
| Nashville Electric Service | $290.45 |
| Nemko Canada | $26,064.00 |
| Newport Board Group LLC | $45,000.00 |
| Nokia Solutions and Networks US, LLC SAC Wireless LLC | $72,294.00 |
| Northcentral Electric Power Association | $72.80 |
| NV Energy | $174.03 |
| Octiv Inc. | $8,100.00 |
| Ohio Power Company dba AEP Ohio | $148.30 |
| Oliveira, Andrew | $1,553.75 |
| Oracle America, Inc. | $9,485.26 |
| Orlando Utilities Commission | $79.45 |
| OSI Electronics | $142,542.74 |

Class 11 - General Unsecured

| Class 11 - General Unsecured | Amount |
|---|---|
| Palomar Communications | $5,250.00 |
| Parker Hannifin Corporation | $10,248.52 |
| Patel, Jignesh | $1,817.42 |
| Pawar, Avinash | $3,240.82 |
| Pedernales Electric Cooperative, Inc. | $170.89 |
| Peralta, Michael | $3,246.71 |
| Peshin, Philip | $6,496.04 |
| Phoenix Mecano, Inc. | $157,814.88 |
| Piedmont Electric Membership Cooperative | $139.37 |
| Pinnacle Towers LLC | $4,163,159.33 |
| Pitney Bowes | $234.57 |
| Pompano Beach Permit Number 16 8062 | $430.00 |
| Praetorian Group. Inc. | $6,800.00 |
| PRECISION GRAPHIC SYSTEMS | $610.68 |
| Pricewaterhouse Coopers LLP. | $60,778.00 |
| Principal Financial Group | $0.71 |
| Promar Designs, Inc. | $10,000.00 |
| Pullman, Aaron | $3,736.68 |
| Quality Systems Integrated Corporation | $3,161.13 |
| Ramsey Electonics, Inc. | $3,793.60 |
| Richardson RFPD | $460.00 |
| Riverside County Tax Collector | $5,678.31 |
| Rocky Mountain Power | $148.73 |
| Roqueni, Jose M | $60,786.28 |
| Rose Bopla Phoenix Mecano. Inc. | $126,614.40 |
| RTx Technology Co., Ltd. | $22,000.00 |
| Ryan, LLC | $3,875.00 |
| Salt River Project | $384.51 |
| San Diego County Tax Collector | $95,711.17 |
| San Diego Pension Consultants | $250.00 |
| Sandra Phan | $29,965.39 |
| Santa Fe ISD | $184.96 |
| SBA Network Services, LLC | $1,102,012.38 |
| Sematext Group, Inc. | $4,655.00 |
| Serrano, Lisa D | $28,738.05 |
| Shelby County Trustee | $188.65 |
| Sheppard Mullin Richter & Hampton LLP | $3,785.70 |
| Signa Digital Solutions | $1,682.67 |
| Silicon Valley Bank Mastercard | $43,718.40 |
| SkyRiver Communications, Inc. Accounts Receivable | $1,145.00 |
| Srikanth Uppala | $216.05 |

Class 11 - General Unsecured

| Class 11 - General Unsecured | Amount |
|---|---|
| SRP | $304.27 |
| SSAE 16 Professionals, LLP | $26,074.00 |
| Staples Business Advantage Staples Contract & Commercial, In | $13,435.79 |
| StarTex Power Constellation Newenergy, Inc. | $374.10 |
| State of California EDD | $40,853.07 |
| Stjepovic, Ana | $6,432.39 |
| Strawn, Mark | $49,384.15 |
| Streamline LLC | $7,048.13 |
| Suelyn Manush Wallace | $17,328.47 |
| Sunil Agrawal | $1,800.00 |
| Talley Inc. | $1,041.12 |
| Tapia, Guadalupe | $2,609.16 |
| TECO | $81.00 |
| Tessco Technologies, Inc. | $3,084.84 |
| The City of East Point Georgia | $582.38 |
| The ProSource Group, Inc. | $33,750.00 |
| Thoughtclan Technologies Pvt. Ltd. | $27,711.30 |
| Timesys Corporation | $23,875.00 |
| TN Metropolitan Trustee | $136.99 |
| Tower Resource Management, LLC | $121,905.80 |
| Town of Landis | $57.80 |
| Tran, Phong | $4,591.34 |
| Tri County Electric Cooperative, Inc. | $151.93 |
| Trilliant Networks (Canada) Inc. | $199,170.39 |
| Underwriters Laboratories Inc. | $1,200.00 |
| United Health Care Wells Fargo Lockbox, E2001 049, | $45,831.69 |
| United of Omaha Life Insurance Company | $2,030.05 |
| United States Treasury | $21,352.71 |
| Vectus | $347.00 |
| Verizon Wireless | $25,929.62 |
| Vicky Taylor | $51,344.93 |
| WellAware Holdings Inc. | $218,400.00 |
| Werner, Dan | $8,871.29 |
| West End Hotel LLC C/O Marshall Fried | $73,231.42 |
| Westpak, Inc. | $1,475.00 |
| William County Trustee | $45.00 |
| William Schmidt | $75,526.71 |
| Witz Communications Inc. | $79,943.50 |
| Xcel Energy Public Service Company of Colorado | $431.38 |
| Yadav, Pratik | $3,320.12 |
| York Electric Cooperative, Inc. | $109.86 |
| Zhang, Qi | $8,187.64 |
| Babak Cyrus Razi (Insider) | $0.00 |
| Department of Industrial Relations | $330,220.00 |
| Department of Industrial Relations | $139,311.00 |
| **Total** [1] | **$16,623,919.97** |

[1] In addition to the foregoing, the claims in Classes 4-8 & 10 will be treated together with Class 11 for distributions purposes, bringing the aggregate claim amount to $44,679,865.12. Grid (Class 4) is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

**Exhibit C**

Exhibit C
Page 131

## Ingenu, Inc. - Effective Date Payments

| | |
|---|---|
| Exit Facility | $1,000,000.00 |
| | |
| DIP Loan | $400,000.00 [1] |
| Administrative Claims | $85,714.00 [2] |
| Class 1 Priority Nontax Claims | $55,343.79 |
| Class 2 Prepetition First Lien Claim of Lakewood | $86,366.69 |
| United States Trustee Fee Payment | $1,950.00 |
| Total | $629,374.48 |
| | |
| **Surplus** | **$370,625.52** |

[1] The Debtor believes that NDJR will allow additional time for repayment should the Debtor need it.

[2] This is an estimated figure.

**Exhibit C**
**Page 132**

## Ingenu Inc. - Cash Flow Projection Under Plan of Reorganization ("Plan")

| | | 2020 | 2021 | | | | 2022 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Q4[1] | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| Revenue | | $0 | $8,400 | $144,000 | $593,000 | $121,875 | $3,313 | $0 |
| Operating expenses | | | | | | | | |
| Compensation | | $124,901 | $122,501 | $122,501 | $122,501 | $122,501 | $122,501 | $122,501 |
| Patents | | 2,230 | 4,460 | 2,230 | - | - | - | - |
| Data center | | 17,008 | 14,755 | 14,755 | 14,755 | 14,755 | 14,755 | 14,755 |
| Storage | | 16,450 | 14,910 | 14,910 | 14,910 | 14,910 | 14,910 | 14,910 |
| Insurance | | 840 | 840 | 840 | 840 | 840 | 840 | 840 |
| Professional fees | | - | - | - | - | - | - | - |
| Other administrative | | 675 | 405 | 405 | 405 | 405 | 405 | 405 |
| Total Operating expenses | | 162,104 | 157,871 | 155,641 | 153,411 | 153,411 | 153,411 | 153,411 |
| EBITDA | | ($162,104) | ($149,471) | ($11,641) | $439,589 | ($31,536) | ($150,098) | ($153,411) |
| Amortization | | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 |
| EBIT | | ($196,716) | ($184,083) | ($46,253) | $404,977 | ($66,148) | ($184,711) | ($188,023) |
| Interest expense | | | | | | | | |
| DIP Facility | 6.1% | $2,263 | $0 | $0 | $0 | $0 | $0 | $0 |
| Exit Facility | 5.0% | 1,804 | 4,644 | 5,136 | 5,367 | 5,401 | 5,316 | 5,523 |
| Total Interest expense | | $4,067 | $4,644 | $5,136 | $5,367 | $5,401 | $5,316 | $5,523 |
| Debtor's counsel[2] | | 150,000 | - | - | - | - | - | - |
| Senior Creditor's counsel[2] | | 32,308 | - | - | - | - | - | - |
| Special IP counsel[2] | | 13,000 | - | - | - | - | - | - |
| Sherwood Partners | | 55,000 | - | - | - | - | - | - |
| Accounting[2] | | 13,000 | - | - | - | - | - | - |
| U.S. Trustee's fee | | 1,950 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 | 1,625 |
| Payments to unsecured claims[3] | | - | - | - | - | - | - | 22,805 |
| Net Income | | ($466,041) | ($190,352) | ($53,014) | $397,985 | ($73,174) | ($191,652) | ($217,976) |
| Operating activities: | | | | | | | | |
| Net income | | ($466,041) | ($190,352) | ($53,014) | $397,985 | ($73,174) | ($191,652) | ($217,976) |
| Amortization | | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 | 34,613 |
| PIK interest | | 1,804 | 4,644 | 5,136 | 5,367 | 5,401 | 5,316 | 5,523 |
| Accounts receivable | | - | 8,125 | - | - | - | - | - |
| Net cash flow from operating activities | | ($429,624) | ($142,971) | ($13,266) | $437,964 | ($33,161) | ($151,723) | ($177,840) |
| Financing activities: | | | | | | | | |
| Payments to Priority Tax Claims[4] | | $0 | ($32,676) | ($32,676) | ($32,676) | ($32,676) | ($32,676) | ($32,676) |
| DIP Facility | | (175,048) | - | - | - | - | - | - |
| Pre-Petition First Lien Claim | | (87,367) | - | - | - | - | - | - |
| Exit Facility | | 616,730 | 175,646 | 45,941 | - | - | - | 55,462 |
| Net cash flow from financing activities | | 354,316 | 142,971 | 13,266 | (32,676) | (32,676) | (32,676) | 22,786 |
| Net increase (decrease) in cash | | ($75,308) | $0 | $0 | $405,289 | ($65,836) | ($184,399) | ($155,054) |
| Cash at beginning of period | | 75,308 | - | - | - | 405,289 | 339,453 | 155,054 |
| Cash at end of period | | $0 | $0 | $0 | $405,289 | $339,453 | $155,054 | $0 |
| Debt schedule[5] | | | | | | | | |
| DIP Facility | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Pre-Petition First Lien Claim | | - | - | - | - | - | - | - |
| Exit Facility | | 618,534 | 798,824 | 849,901 | 855,268 | 860,669 | 865,985 | 926,970 |

[1]Assumes company exits bankruptcy on November 30, 2020.

[2]November per Chapter 11 budget.

[3]Assumes 28% combined federal and state tax rate.

[4]Based on Prioity Tax Claims of $653,313 paid quarterly over 5 years.

[5]Assumes Pre-Petition Second Lien Claim is fully converted to equity.

**Exhibit C**
**Page 133**

**Exhibit D**

Ingenu, Inc.
**Chapter 7 Liquidation Analysis**

| Assets | Scheduled Value | Liquidation Value |
|---|---|---|
| Cash | $22.00 | $22.00 |
| Accounts Receivable | $31,000.00 | $31,000.00 |
| Interest in Indo Subsidiary | Unknown | |
| Inventory | $1,320,000.00 | $1,320,000.00 |
| Office furniture/fixtures/ | $150,000.00 | $20,000.00 |
| Patents/Copyrights/ | Unknown | |
| Domain Name | Unknown | |
| Licenses | Unknown | |
| Source Code | Unknown | |
| ASIC - Plan for Chips | Unknown | |
| Unused Net Operating Loss | Unknown | |
| Causes of Action v. Third Parties | Unknown | |
| | | |
| *Available Proceeds* | *$1,501,022.00* | *$1,371,022.00* |

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| **All Secured Creditors - Classes 2-8, 10** | | | |
| Lakefront Associates LLC | $86,366.69 | $86,366.69 | 100.00% |
| NDJR (2nd lien) Grid | $16,243,041.14 | $1,284,655.31 | 7.91% |
| | | | |
| Grid Partners III A (3rd lien): [1] | $17,853,654.92 | $0.00 | 0.00% |
| John S. Gilbert or Barbara | | | |
| Gilbert (4th lien): | $1,151,780.82 | $0.00 | 0.00% |
| LFT (4th lien): | $2,297,758.90 | $0.00 | 0.00% |
| JBJK (4th lien): | $3,764,426.71 | $0.00 | 0.00% |
| Trilliant Networks (Canada) | | | |
| Inc. (5th Lien) | $2,737,388.89 | $0.00 | 0.00% |
| Snezana Stjepovic | $35,542.79 | $0.00 | 0.00% |
| Frank Castaneda | $18,838.71 | $0.00 | 0.00% |
| Travis Hornung | $21,291.28 | $0.00 | 0.00% |
| William Simpson | $35,153.08 | $0.00 | 0.00% |
| Hafiz Hameed | $28,364.94 | $0.00 | 0.00% |
| Serrano, Lisa D | $10,207.23 | $0.00 | 0.00% |
| TTM | $101,536.88 | $0.00 | 0.00% |
| *Total:* | *$44,385,352.98* | *$1,371,022.00* | |
| *Available Proceeds:* | | $0.00 | |
| | | | |
| **Chapter 7 Trustee Fees** | $41,130.66 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |
| | | | |
| **Chapter 7 Administration Fees** | $0.00 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |

[1]Grid is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

Ingenu, Inc.
**Chapter 7 Liquidation Analysis**

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| **Chapter 11 Administration Fees** | | | |
| Sullivan Hill Rez & Engel, APLC | $0.00 | $0.00 | 0.00% |
| Shustak Reynolds & Partners | $0.00 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |
| | | | |
| **Priority Tax Claims - No Class** | | | |
| Internal Revenue Service | $463,702.14 | $0.00 | 0.00% |
| State of California EDD | $87,291.54 | $0.00 | 0.00% |
| Arizona Dept. of Revenue | $2,900.00 | $0.00 | 0.00% |
| Arizona Dept. of Revenue | $200.00 | $0.00 | 0.00% |
| County of San Bernardino | $419.75 | $0.00 | 0.00% |
| Sumner County Trustee | $42.54 | $0.00 | 0.00% |
| Riverside County Tax | $1,633.34 | $0.00 | 0.00% |
| Franchise Tax Board | $1,681.95 | $0.00 | 0.00% |
| Bureau of Revenue and Taxation Parish of Jefferson | $303.53 | $0.00 | 0.00% |
| California Department of Tax & Fee Admin | $562.00 | $0.00 | 0.00% |
| City of Union City Property | $173.29 | $0.00 | 0.00% |
| Collin County Tax Collector | $315.31 | $0.00 | 0.00% |
| Dekalb County Tax | $28.23 | $0.00 | 0.00% |
| DENTON COUNTY TAX ASSESSOR/COLLECTOR | $590.61 | $0.00 | 0.00% |
| Fulton County Tax | $445.99 | $0.00 | 0.00% |
| Harris County Tax Collector | $1,056.80 | $0.00 | 0.00% |
| City of Hendersonville Property Tax Office | $16.00 | $0.00 | 0.00% |
| Marion County Tax Collector | $73.82 | $0.00 | 0.00% |
| PASADENA ISD TAX ASSESSOR/COLLECTOR | $210.28 | $0.00 | 0.00% |
| Travis County Tax Office | $1,368.58 | $0.00 | 0.00% |
| Wilson County Tax Office | $235.68 | $0.00 | 0.00% |
| ALDINE I.S.D. | $938.31 | $0.00 | 0.00% |
| ALDINE I.S.D. | $754.44 | $0.00 | 0.00% |
| ALLEN ISD | $978.43 | $0.00 | 0.00% |
| Bexar County | $10,949.61 | $0.00 | 0.00% |
| Bexar County District Clerk | $579.00 | $0.00 | 0.00% |
| CITY OF ALLEN | $332.19 | $0.00 | 0.00% |
| City of AZLE | $988.48 | $0.00 | 0.00% |
| CITY OF FRISCO | $108.52 | $0.00 | 0.00% |
| City of Garland | $1,262.92 | $0.00 | 0.00% |
| CITY OF LUCAS | $198.20 | $0.00 | 0.00% |
| County of San Bernardino | $2,059.40 | $0.00 | 0.00% |
| DALLAS COUNTY | $8,538.32 | $0.00 | 0.00% |
| Fort Bend County | $161.72 | $0.00 | 0.00% |
| Fort Bend County | $1,759.43 | $0.00 | 0.00% |

Ingenu, Inc.
**Chapter 7 Liquidation Analysis**

|  | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| Galveston County | $2,383.12 | $0.00 | 0.00% |
| Garland ISD | $2,376.35 | $0.00 | 0.00% |
| John P Dilman | $5,780.84 | $0.00 | 0.00% |
| Lewisville ISD | $934.77 | $0.00 | 0.00% |
| Metro Government of | $67.68 | $0.00 | 0.00% |
| Metro Government of | $83.73 | $0.00 | 0.00% |
| Metro Government of | $235.19 | $0.00 | 0.00% |
| Metro Government of | $246.13 | $0.00 | 0.00% |
| Metro Government of | $255.34 | $0.00 | 0.00% |
| Metro Government of | $268.92 | $0.00 | 0.00% |
| Metro Government of | $2,065.79 | $0.00 | 0.00% |
| Metro Government of | $2,065.79 | $0.00 | 0.00% |
| Metro Government of | $2,365.72 | $0.00 | 0.00% |
| Metro Government of | $2,365.72 | $0.00 | 0.00% |
| Metro Government of | $2,365.72 | $0.00 | 0.00% |
| Metro Government of | $2,739.57 | $0.00 | 0.00% |
| Metro Government of | $2,739.57 | $0.00 | 0.00% |
| Metro Government of | $3,115.49 | $0.00 | 0.00% |
| Metro Government of | $3,115.49 | $0.00 | 0.00% |
| Metro Government of | $3,115.49 | $0.00 | 0.00% |
| Montgomery County | $1,474.42 | $0.00 | 0.00% |
| PARKER CAD | $1,080.81 | $0.00 | 0.00% |
| Plano Independent School | $1,777.26 | $0.00 | 0.00% |
| Riverside County Tax | $7,311.65 | $0.00 | 0.00% |
| Sumner County Trustee | $42.54 | $0.00 | 0.00% |
| TARRANT COUNTY | $9,790.99 | $0.00 | 0.00% |
| Texas City ISD | $488.95 | $0.00 | 0.00% |
| Collin County Tax Collector | $384.59 | $0.00 | 0.00% |
| Collin County Tax Collector | $146.74 | $0.00 | 0.00% |
| Collin County Tax Collector | $152.97 | $0.00 | 0.00% |
| *Total:* | *$654,197.69* | | |
| *Available Proceeds:* | *$0.00* | *$0.00* | |
| | | | |
| **Priority Unsecured Claims - Class 1** | | | |
| Colleen Cleary | $13,650.00 | $0.00 | 0.00% |
| Ferderick Price | $13,650.00 | $0.00 | 0.00% |
| United Healthcare Insurance Co | $28,043.79 | $0.00 | 0.00% |
| *Total:* | *$55,343.79* | | |
| *Available Proceeds:* | *$0.00* | *$0.00* | |
| | | | |
| **General Unsecured Claims - Cla** | $16,623,919.97 | $0.00 | 0.00% |
| | | | |
| *Total Claims:* | *$61,718,814.43* | | |
| *Available Proceeds:* | *$0.00* | | |
| | | | |
| **Equity Security Holders** | $120,000,000 | $0.00 | 0.00% |

**Ingenu, Inc.**
**Chapter 7 Liquidation Analysis**

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| *Available Proceeds:* | $0.00 | | |

**Ingenu, Inc.**

**Chapter 11 Analysis - Best Case - $500,000**

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| **Secured Creditors - Classes 2-8, 10** | | | |
| Lakefront Associates LLC  (1st Lien) | $86,366.69 | $86,366.69 | 100.00% |
| NDJR (2nd lien) Grid Partners II: | $16,243,041.14 | Converted to Equity | |
| Grid Partners III A (3rd lien): [1] | $17,853,654.92 | Treated in Class 11 | |
| John S. Gilbert or Barbara Gilbert (4th lien): | $1,151,780.82 | Treated in Class 11 | |
| LFT (4th lien): | $2,297,758.90 | Treated in Class 11 | |
| JBJK (4th lien): | $3,764,426.71 | Treated in Class 11 | |
| Trilliant Networks (Canada) Inc. (5th Lien) | $2,737,388.89 | Treated in Class 11 | |
| Snezana Stjepovic | $35,542.79 | Treated in Class 11 | |
| Frank Castaneda | $18,838.71 | Treated in Class 11 | |
| Travis Hornung | $21,291.28 | Treated in Class 11 | |
| William Simpson | $35,153.08 | Treated in Class 11 | |
| Hafiz Hameed | $28,364.94 | Treated in Class 11 | |
| Serrano, Lisa D | $10,207.23 | Treated in Class 11 | |
| TTM | $101,536.88 | Treated in Class 11 | |
| *Total:* | *$44,385,352.98* | *$86,366.69* | |
| | | | |
| **Chapter 11 Administration Fees** | | | |
| Sullivan Hill Rez & Engel, APLC | $150,000.00 | $150,000.00 | 100.00% |
| Shustak Reynolds & Partners | $13,000.00 | $13,000.00 | 100.00% |
| *Total* | *$163,000.00* | *$163,000.00* | |
| | | | |
| **Priority Tax Claims - Unclassified** | $654,197.69 | $654,197.69 | 100.00% |
| | | | |
| **Priority Unsecured Claims - Class 1** | | | |
| Colleen Cleary | $13,650.00 | $13,650.00 | 100.00% |
| Ferderick Price | $13,650.00 | $13,650.00 | 100.00% |
| United Healthcare Insurance Company | $28,043.79 | $28,043.79 | 100.00% |
| *Total* | *$55,343.79* | *$55,343.79* | |
| | | | |
| **General Unsecured Claims - Class 11** | $16,623,919.97 [2] | | |
| **Class 4-8, 10 & 11 Total** | $44,679,865.12 [3] | $500,000.00 | 1.12% |
| | | | |
| **Equity Security Holders** | $120,000,000 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |

[1]Grid is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

[2]This is the aggregate number of general unsecured claims.

[3]This number includes classes 4-8, 10 and 11. Grid (Class 4) is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

**Ingenu, Inc.**

**Chapter 11 Analysis - Mid Case - $250,000**

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| **Secured Creditors - Classes 2-8, 10** | | | |
| Lakefront Associates LLC  (1st Lien) | $86,366.69 | $86,366.69 | 100.00% |
| NDJR (2nd lien) Grid Partners II: | $16,243,041.14 | Converted to Equity | |
| Grid Partners III A (3rd lien): [1] | $17,853,654.92 | Treated in Class 11 | |
| John S. Gilbert or Barbara Gilbert (4th lien): | $1,151,780.82 | Treated in Class 11 | |
| LFT (4th lien): | $2,297,758.90 | Treated in Class 11 | |
| JBJK (4th lien): | $3,764,426.71 | Treated in Class 11 | |
| Trilliant Networks (Canada) Inc. (5th Lien) | $2,737,388.89 | Treated in Class 11 | |
| Snezana Stjepovic | $35,542.79 | Treated in Class 11 | |
| Frank Castaneda | $18,838.71 | Treated in Class 11 | |
| Travis Hornung | $21,291.28 | Treated in Class 11 | |
| William Simpson | $35,153.08 | Treated in Class 11 | |
| Hafiz Hameed | $28,364.94 | Treated in Class 11 | |
| Serrano, Lisa D | $10,207.23 | Treated in Class 11 | |
| TTM | $101,536.88 | Treated in Class 11 | |
| *Total:* | *$44,385,352.98* | *$86,366.69* | |
| | | | |
| **Chapter 11 Administration Fees** | | | |
| Sullivan Hill Rez & Engel, APLC | $150,000.00 | $150,000.00 | 100.00% |
| Shustak Reynolds & Partners | $13,000.00 | $13,000.00 | 100.00% |
| *Total* | *$163,000.00* | *$163,000.00* | |
| | | | |
| **Priority Tax Claims - Unclassified** | $654,197.69 | $654,197.69 | 100.00% |
| | | | |
| **Priority Unsecured Claims - Class 1** | | | |
| Colleen Cleary | $13,650.00 | $13,650.00 | 100.00% |
| Ferderick Price | $13,650.00 | $13,650.00 | 100.00% |
| United Healthcare Insurance Company | $28,043.79 | $28,043.79 | 100.00% |
| *Total* | *$55,343.79* | *$55,343.79* | |
| | | | |
| **General Unsecured Claims - Class 11** | $16,623,919.97 [2] | | |
| **Class 4-8, 10 & 11 Total** | $44,679,865.12 [3] | $250,000.00 | 0.56% |
| | | | |
| **Equity Security Holders** | $120,000,000 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |

[1]Grid is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

[2]This is the aggregate number of general unsecured claims.

[3]This number includes classes 4-8, 10 and 11.  Grid (Class 4) is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

**Ingenu, Inc.**
**Chapter 11 Analysis - Worst Case - $0**

| | Claim Amount | Dollar Recovery | Recovery Rate |
|---|---|---|---|
| **Secured Creditors - Classes 2-8, 10** | | | |
| Lakefront Associates LLC  (1st Lien) | $86,366.69 | $86,366.69 | 100.00% |
| NDJR (2nd lien) Grid Partners II: | $16,243,041.14 | Converted to Equity | |
| Grid Partners III A (3rd lien): [1] | $17,853,654.92 | Treated in Class 11 | |
| John S. Gilbert or Barbara Gilbert (4th lien): | $1,151,780.82 | Treated in Class 11 | |
| LFT (4th lien): | $2,297,758.90 | Treated in Class 11 | |
| JBJK (4th lien): | $3,764,426.71 | Treated in Class 11 | |
| Trilliant Networks (Canada) Inc. (5th Lien) | $2,737,388.89 | Treated in Class 11 | |
| Snezana Stjepovic | $35,542.79 | Treated in Class 11 | |
| Frank Castaneda | $18,838.71 | Treated in Class 11 | |
| Travis Hornung | $21,291.28 | Treated in Class 11 | |
| William Simpson | $35,153.08 | Treated in Class 11 | |
| Hafiz Hameed | $28,364.94 | Treated in Class 11 | |
| Serrano, Lisa D | $10,207.23 | Treated in Class 11 | |
| TTM | $101,536.88 | Treated in Class 11 | |
| *Total:* | *$44,385,352.98* | *$86,366.69* | |
| | | | |
| **Chapter 11 Administration Fees** | | | |
| Sullivan Hill Rez & Engel, APLC | $150,000.00 | $150,000.00 | 100.00% |
| Shustak Reynolds & Partners | $13,000.00 | $13,000.00 | 100.00% |
| *Total* | *$163,000.00* | *$163,000.00* | |
| | | | |
| **Priority Tax Claims - Unclassified** | $654,197.69 | $654,197.69 | 100.00% |
| | | | |
| **Priority Unsecured Claims - Class 1** | | | |
| Colleen Cleary | $13,650.00 | $13,650.00 | 100.00% |
| Ferderick Price | $13,650.00 | $13,650.00 | 100.00% |
| United Healthcare Insurance Company | $28,043.79 | $28,043.79 | 100.00% |
| *Total* | *$55,343.79* | *$55,343.79* | |
| | | | |
| **General Unsecured Claims - Class 11** | $16,623,919.97 [2] | | |
| **Class 4-8, 10 & 11 Total** | $44,679,865.12 [3] | $0.00 | 0.00% |
| | | | |
| **Equity Security Holders** | $120,000,000 | $0.00 | 0.00% |
| *Available Proceeds:* | $0.00 | | |

[1]Grid is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.

[2]This is the aggregate number of general unsecured claims.

[3]This number includes classes 4-8, 10 and 11. Grid (Class 4) is an entity controlled by Babak Razi, a former insider and CEO of the Debtor.